**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | |
|---|---|
| **WEST TENNESSEE AIR SERVICE, LLC,** | |
| Plaintiff/ Counter-Defendant, | Civil Action: 1:23-CV-1132-STA-jay |
| vs. | |
| **WTAS LLC, KYLE E. RICH, and MELODY L. RICH,** | **DEFENDANTS' CONSOLIDATED, AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT** |
| Defendants/Counter-Plaintiffs. | |
| **WTAS LLC, KYLE E. RICH, and MELODY L. RICH,** | |
| Third-Party Plaintiffs/Counter-Plaintiffs, | |
| vs. | |
| **MONTE WARNE; MARIANNA WILLIAMS, individually; MARIANNA WILLIAMS, as TRUSTEE of the MEREDITH Z. WARNE FAMILY TRUST; and ASHLEY & ARNOLD, a partnership,** | |
| Third-Party Defendant/Counter-Defendants | |

**WTAS LLC, KYLE E. RICH, AND MELODY L. RICH'S**
**CONSOLIDATED AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

**COME NOW**, the Defendants/Counter-Plaintiffs, WTAS, LLC, Kyle E. Rich, and Melody L. Rich, (the "Riches" and "WTAS") by and through the undersigned counsel, and make this Consolidated Amended Counterclaim and Third-Party Complaint. This Consolidated and Amended Counterclaim and Third-Party Complaint shall amend and replace the Counter-Claim

1

(ECF No. 7) but not the Answer and affirmative defenses, and amend and replace the third-party complaint (ECF No. 9). The Riches and WTAS, however, incorporate by reference herein the Asset Purchase Agreement filed at ECF No. 7-1.[1]

## PARTIES; JURISDICTION; VENUE

1.      Counter-Plaintiff Kyle E. Rich is a citizen of the State of Iowa.

2.      Counter-Plaintiff Melody L. Rich is a citizen of the State of Iowa.

3.      Counter-Plaintiffs Kyle Rich and Plaintiff Melody Rich are members of Counter-Plaintiff WTAS, which is a business entity registered to do business in the State of Tennessee.

4.      Upon information and belief, Plaintiff/Counter-Defendant West Tennessee Air Service, LLC, ("Plaintiff") is a business entity registered to do business in the State of Tennessee, whose members, Monte Warne and Marianna "Molly" Williams as Trustee of the Meredith Z. Warne Family Trust, are citizens of the State of Tennessee.

5.      Upon information and belief, Third-Party Defendant and Counter-Defendant Monte Warne ("Warne") is a citizen of the State of Tennessee and is a resident of Dyer County, Tennessee.

6.      Upon information and belief, Third-Party Defendant and Counter-Defendant Marianna "Molly" Williams ("Williams") is a citizen of the State of Tennessee and is a resident of Dyer County, Tennessee.

7.      Upon information and belief, Williams was at times relevant herein and presently is the Trustee of the Meredith Z. Warne Family Trust. Williams, in her office as Trustee, is a Third-Party Defendant and Counter-Defendant herein.

---

[1] This Consolidated Amended Counterclaim and Third-Party Complaint is filed pursuant to the Court's Order of October 28, 2024 (ECF No. 154), which struck the version of this document filed at ECF No. 82.

8.     Ashley & Arnold ("Ashley & Arnold")(a/k/a/ Ashley, Ashley & Arnold) is a partnership or unincorporated association of attorneys practicing as a law firm that is unregistered with the Secretary of State of the State of Tennessee.  Upon information and belief, Williams works for Ashley & Arnold.  It is a Third-Party Defendant and Counter-Defendant.

9.     This Court has personal jurisdiction over the parties to this action.

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount-in-controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) as well as 28 U.S.C. § 1391(b)(2).

**FACTS**

I.     WARNE AND PLAINTIFF FRAUDULENTLY MISREPRESENTED THE GOODWILL AND GOING CONCERN VALUE OF WEST TENNESSEE AIR SERVICE

12.     The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

13.     Warne managed, operated and had an ownership interest in First-Party Plaintiff West Tennessee Air Service, LLC.  Unless context requires otherwise, West Tennessee Air Service LLC will be referred to by full name or simply "Plaintiff." [2]

---

[2] The Plaintiff, West Tennessee Air Service LLC, formerly operated the crop spraying business doing business as "West Tennessee Air Service."  Third-Party Defendant Monte Warne was the owner/operator and agent of Plaintiff.  WTAS, LLC purchased the name West Tennessee Air Service and did business under that name.  For clarities' sake, where reference is being made to the assets or operation of the business that WTAS purchased, the term "West Tennessee Air Service" will be used, as distinct from references to the Plaintiff-seller which shall simply be referred to as "West Tennessee Air Service LLC" or simply "Plaintiff."  The name WTAS is used for the Defendant-purchaser, which purchased the name West Tennessee Air Service from Plaintiff.

14.    Counter-Defendant West Tennessee Air Service was a business engaged in aerial application or crop spraying in Dyer County, Carroll County, and Gibson County Tennessee.

15.    Monte Warne ("Warne") managed, operated, and had an ownership interest in Plaintiff/Counter-Defendant.

16.    The Meredith Z. Warne Family Trust (the "Trust") by and through its Trustee, is the ninety-nine percent (99%) member of West Tennessee Air Service.

17.    Williams became the Trustee of the Trust on or about April 12, 2021.

18.    Williams and the law firm Ashley & Arnold were additionally and simultaneously legal counsel for Warne and the Trust, succeeding Michael Gauldin, at all times relevant herein.

19.    At all relevant times, Warne was authorized to act and did act as an owner, officer, and agent and/or acted on behalf of West Tennessee Air Service.

20.    At all relevant times, Warne had actual, apparent, or ostensible authority to act as an agent and/or on behalf of Plaintiff and did so act.

21.    At all relevant times subsequent to April 12, 2021, Williams had actual, apparent, or ostensible authority to act as an agent and/or on behalf of Plaintiff.

22.    On or about December 11, 2020, Warne, acting as an agent and/or on behalf of Plaintiff published an online advertisement to sell West Tennessee Air Service on a website called "Barnstormers.com" which is a website described as "Aviation's Busiest Marketplace."

23.    The advertisement aforementioned read:

> TURN KEY OPERATION • FOR SALE • I am planning my retirement after 45 years ag. Guaranteed customers & collection. Will train/fly for buyer over next 5 years.  One plane operation with low time 2013 Air Tractor 402-B-34 and 3 nice load trucks. • Contact Monte Warne, Owner - located Dyersburg, TN 38024 United States • Telephone: 731-676 7971 • Fax: 731-286-2453 • Posted December 11, 2020

4

24.     On or about December 16, 2020, Warne, then posted a second online advertisement

on "Barnstormers.com."

25.     The advertisement aforementioned read:

> RARE OPPORTUNITY • FOR SALE • After 45 years of AG flying
> I'm seeking a motivated buyer for my operation. All customers and
> collections guaranteed from 3rd party. All equipment is nice and
> well serviced -2013 AT402B-34 2200TTEA 3 satellite locations
> includes 2 water/fuel trucks and 1 Auger Dan 4300 Int. Average
> ferry is 8 mi. With 4 average years business will pay for it self. This
> is a turn key business with fresh annual,20,000gal+ Jet A, Insurance
> paid for 2021! Strap in and go to work! Must have AG experience
> and turbine insurable. I will be a part of the day to day operation as
> long as needed. • Contact Monte Warne , Owner - located
> Dyersburg, TN 38024 United States • Telephone: 731-676 7971 •
> Fax: 731-286-2453 • Posted December 16, 2020.

26.     Plaintiff, by and through Warne, and Warne individually made material statements,

representations, or promises such as, among other things, "Guaranteed customers & collection,"

"After 45 years ag flying," "Turn key operation," "All customers and collections guaranteed from

3rd party," "With 4 average years business will pay for it self (sic)," "Average ferry is 8 mi,"

"insurance paid for 2021!" and "This is a turn key business."

27.     The statements, representations, and promises regarding West Tennessee Air

Service caused or induced the Riches and WTAS to form an interest in purchasing West Tennessee

Air Service.

28.     The Riches responded to the advertisement by contacting Warne.

29.     In January 2021, the Riches, Warne, and Plaintiff by and through Warne, engaged

in discussions regarding all aspects of West Tennessee Air Service, and began to negotiate an

agreement for the Riches and WTAS to purchase, among other things, the trade name "West

Tennessee Air Service," goodwill, going concern, equipment, customer files, customer

information, billing information, pricing information, and advertising and promotion material ("Assets").

30.    Throughout the course of the discussion and negotiation beginning in January 2021, Plaintiff and Warne made material statements, representations, or promises similar in nature to those contained in the advertisement quoted above, including but not limited to: representations concerning the financial statements and reports from West Tenn. Ag Services, Merimont Aviation and West Tennessee Air Service relevant to Warne and Plaintiff's operations; Warne's successful operation of West Tenn. Ag Services and of West Tennessee Air Service, its past, current, and future revenue projection/outlook; the strength and numerosity of its customer base; the 70,000 acres that Warne and Plaintiff service, and their positive reputation and goodwill and going concern value.

31.    Warne and Plaintiff by and through Warne made material misrepresentations with respect to Warne and Plaintiff's goodwill, reputation, customer base and size, success in the industry, the number of acres serviced, and existence of a kickback scheme.

32.    Plaintiff and Warne repeatedly represented in January 2021 through March 31, 2021 that Warne had 45 years of experience in the aerial application or crop spraying industry; that he had been running a business known as West Tennessee Ag Service for 8 years and then a second crop dusting business known as West Tennessee Air Service beginning 2019 which acquired all of the business that West Tennessee Ag Service had been doing and its assets. Warne also represented that was an owner of Merimont Aviation (named after himself and his wife) which provided all of the pilot services for West Tennessee Ag Service, "flying every acre" for the company.

33.     Plaintiff and Warne provided financial statements for West Tennessee Ag Service, West Tennessee Air Service, LLC, and the general ledger of Merimont Aviation which charge West Tennessee Ag Service for his pilot's fee provided to West Tennessee Ag Service.

34.     Plaintiff and Warne represented in writing the gross crop dusting/aerial application revenues that West Tennessee Ag Services for the years 2016 through 2019 were approximately $2,885,000 and assured the Riches that they could count on Warne's calculations and the calculations of Merimont Aviation in this regard to be "100%" correct. Upon information and belief, that representation was false and fraudulent or a negligent misrepresentation in furtherance of fraudulently inducing the Riches and WTAS to purchase the assets of West Tennessee Air Service and execute the Asset Purchase Agreement.

35.     Plaintiff and Warne expressly created a relationship of trust with the Riches and told them that they could trust and rely on them and that they would do everything that they could to help the Riches and WTAS succeed.

36.     Plaintiff and Warne also represented that they had an extensive customer base who hired him and Plaintiff to perform aerial application services for approximately 70,000 acres. These representations were false and fraudulent or a negligent misrepresentation.  Plaintiff and Warne represented or promised the Riches that the Riches would be able to operate a successful aerial application and crop spraying business because of the goodwill, reputation, customer base and size, and previous success of Plaintiff.[3]

37.     Plaintiff and Warne represented to the Riches that they would acquire Plaintiff's customers, accounts, connections, goodwill and going concern value.

---

[3] The customers referenced throughout this action are landowners or farmers, herein referred to as "Growers."

38.     Consistent therewith, Plaintiff and Warne promised to provide the Riches and WTAS with customer lists, customer information, customer billing information, pricing information, and advertising and promotion materials.

39.     Plaintiff and Warne identified the location(s) and acres that the Riches and WTAS would service in the event that the Counterclaimants purchased assets and other aspects of West Tennessee Air Services, LLC.

40.     Plaintiff/Counter-Defendant and Warne represented or promised to assist the Riches and WTAS in operating their business in the event that the Riches and WTAS purchased assets and other aspects of West Tennessee Air Services, LLC.

41.     Plaintiff and Warne represented or promised the Riches and WTAS that their business would operate as efficiently and at the same capacity as West Tennessee Air Services, LLC, was represented to them as operating with guaranteed customers and collections.

42.     Plaintiff and Warne represented or promised that the Riches and WTAS business would enjoy a continuation of the represented business success of West Tennessee Ag Services, LLC and West Tennessee Air Services, LLC.

43.     On one or more occasions, Plaintiff and Warne coordinated meetings or discussions between the Riches and WTAS, Warne, and Wes Bradley ("Bradley"), a non-party who worked for Nutrien Ag Solutions.

44.     At all relevant times, Bradley was a representative, agent, or employee of Nutrien Ag Solutions, and was engaged in selling or marketing aerially applied chemicals or sprays.

45.     Plaintiff and Warne represented to the Riches that Nutrien Ag Solutions or Bradley was one source of business or revenue for Plaintiff and that Plaintiff and Warne had an "exclusive" and "on call" agreement with Nutrien to provide aerial spray services to customers of Nutrien in

West Tennessee. Plaintiff and Warne represented to the Riches and WTAS that they would have guaranteed customers and collections and receive and/or be assigned the exclusive and on call dealing arrangement with Nutrien Ag Solutions to induce them to purchase the Assets.

II.    NEGOTIATION OF THE ASSET PURCHASE AGREEMENT IS FRAUGHT WITH WRONGFUL CONDUCT AND FRAUD BY PLAINTIFF, WARNE, AND WILLIAMS

46.    The representations and promises made by the Plaintiff and Warne induced the Riches to continue negotiations; induced the Riches and WTAS to secure financing from two Iowa lending institutions in the amount of $875,000.00; and ultimately induced the Riches and WTAS to enter into an Asset Purchase Agreement dated March 31, 2021, containing a purchase price in the amount of 1.8 million dollars.[4] The Asset Purchase Agreement is filed at ECF No. 7-1 and referenced herein as Exhibit 1 and cited by PageID.

47.    Beginning in February 2021, Williams was acting on behalf of Plaintiff and Warne as counsel with respect to the negotiations related to the Asset Purchase Agreement.

48.    In February and March 2021, the Riches were also represented by counsel in the state of Iowa with respect to the negotiations related to the Asset Purchase Agreement.

49.    On or about February 23, 2021, the Riches through counsel requested that Williams prepare the corporate formation documents for WTAS LLC, which would be owned and controlled by the Riches, and to file those documents with the Tennessee Secretary of State.

50.    Without the knowledge or consent of the Riches' Iowa counsel, Williams encouraged Melody Rich to execute a written agreement with Plaintiff and Warne rather than do

---

[4] The Asset Purchase Agreement contains internally numbered Exhibits A through F. The Promissory Note is Exhibit F to the Asset Purchase Agreement.

a "handshake" agreement and assisted the Riches in creating and organizing the entity that would

execute the Asset Purchase Agreement.

51.    Williams, by and through her acts represented the Riches to organize and create

WTAS, a party to the APA.

52.    Through Williams acts and omissions, undertook or created the appearance if not

the fact of having undertaken a general representation of the Riches with respect to the negotiation

of the Asset Purchase Agreement.

53.    Williams owed the Riches and WTAS a fiduciary duty of utmost good faith,

absolute candor and loyalty.

54.    For a period beginning on or about February 23, 2021, and through the closing date

of the Asset Purchase Agreement, Williams represented the Riches, Warne, the Trust, and Plaintiff.

55.    During Williams' representation of the Riches and with respect to the Riches:

    a.    Williams did not act competently under the circumstance by failing to enter into

        a written engagement agreement detailing the scope and limitations of her

        representation;

    b.    Williams did not act competently by failing to provide a "I'm not your lawyer

        letter" or communicate the limitations of her representation, if any;

    c.    Williams failed to communicate her ethical obligations or the effect of her

        present conflict of interest caused by her representation of Warne and the Trust,

        who were then adverse parties to the Riches, in a way that permitted the Riches

        to make informed decisions regarding the representation;

d.  Williams failed to obtain an agreement, informed consent or waiver of conflicts, whether in writing or otherwise, of the Riches or Warne with respect to a present conflict of interest;

e.  Williams communicated about the need for the Asset Purchase Agreement with Plaintiff and Warne, whom she then knew were represented by another lawyer, without their other lawyer's participation, knowledge, or consent.

56.  As a direct result of Williams' acts and omissions, including but not limited to those described above, the Riches reasonably believed that Williams was their lawyer without restriction or limitation.  The Riches, therefore, believed and relied on their belief that Williams' advice and counsel was honest, objective, competent, and untainted by a conflict of interest.

57.  Williams voluntarily and without disclaimer engaged the Riches in conversations in connection with Asset Purchase Agreement.  The Riches believed Williams to be giving them advice and counsel is her capacity as their lawyer.

58.  The Riches relied on Williams' omission in raising any concerns with them as an indication of her lack of concerns with the deal.

59.  Williams testified in her deposition that she was present for an in-person conference with the Riches and Warne, during which Williams either stated or heard Warne to state to the Riches that Kelli Bradley would be paid $0.50 per acre for performing billing and collection services for the Riches.

60.  Williams further admitted that when the statement regarding Kelli Bradley's services was made, she knew the arrangement was a kickback and not a bona fide transaction, that was false and a misrepresentation of the true nature and purpose of the payments to Kelli Bradley.

61.     Williams was aware that the true nature of the contractual agreement to pay Kelli Bradley $0.50 per acre was not exclusively to obtain her services of billing and collecting but rather to incentivize and maintain Kelli Bradley's husband, Wes Bradley, to continue referring Nutrien customers and Nutrien business to the Riches and WTAS.  In short, a kickback scheme.

62.     Williams further admits to knowing from her professional experience that "pay-for-play" was how the crop-dusting business worked in West Tennessee, and if the Riches did not pay Kelli Bradley, they would not receive work from Wes Bradley and Nutrien.

63.     Williams had strong opinions of the kickback scheme and believed it to be and "offensive."

64.     Williams had a fiduciary duty to explain the true nature of the kickback scheme to the Riches.

65.     Despite believing the kickback scheme to be "offensive" and a plan that she would not participate in and despite having a fiduciary duty to tell the Riches about the scheme, she admits that she did not tell the Riches.

66.     Williams wrongfully failed to explain the true nature of the kick back to the Riches. But for Williams' breach of her fiduciary duty by failing to advise the Riches of the kickback scheme, the Riches would not have executed the Asset Purchase Agreement including the related documents.

III.    PLAINTIFF, WARNE, AND WILLIAMS BREACH THE ASSET PURCHASE AGREEMENT AND FRAUDULENT PERFORMANCE OF THE CONTRACT

67.     **Exhibit E** of the Agreement contains the Consulting, Non-Competition, and Confidentiality Agreement with Monte Warne ("Consulting Agreement" or "**Exhibit E**")[5], which states Warne's obligations, including the services to be performed by him for the benefit of the

---

[5] See ECF No. 7-1, page 20-23; PageID 104-07.

12

Riches and WTAS which were an inducement to purchase the Assets. **Exhibit E** is a material part of the Asset Purchase Agreement and contains provisions that are material to the Asset Purchase Agreement and an inducement to execute the Asset Purchase Agreement.

68.    **Exhibit E** of the Agreement contains contractual obligations and representations and states in part that Warne agreed to:

    a.    "Work with managers of Nutrien Ag Solutions to maintain vendor contract with WTAS to provide exclusive service as 'on call' provider for work as needed." (ECF 7-1, PageID 104);

    b.    "Maintain records of chemicals applied as required by the Tennessee Department of Agriculture."  (ECF 7-1, PageID 104);

    c.    "Maintain records for all customer dates/locations of work." (ECF 7-1, PageID 104); and

    d.    "Maintain FAA 137 operator's certificate as chief pilot over operation." (ECF 7-1, PageID 104).

69.    **Exhibit E** of the Agreement is consistent with previous statements, representations, and promises made by Warne that he "shall conform to high standards of work and business ethics and devote the hours necessary to ensure that WTAS continue to operate efficiently and at the same capacity as prior to the effective date herein."

70.    **Exhibit E** of the Agreement also provides that Warne "shall not encourage, in any way or for any reason, any suppliers, customers, or prospective customers, to sever or alter its relationship with the Riches and WTAS unless specifically asked to do so."

71.    **Exhibit E** of the Agreement also contains a provision stating that the Riches and WTAS agreed to compensate Kelli Bradley, who is Bradley's spouse, fifty cents ($0.50) per acre for bookkeeping and accounting services.

72.    Under the Asset Purchase Agreement, among other things, the Riches and WTAS agreed to purchase the tradename, goodwill, customer information, and assets of West Tennessee Air Service.

73.    The Riches and WTAS did not receive any customer information, customer lists, billing information, or the like, as Warne promised and as stated in the Asset Purchase Agreement for the time period prior to January 1, 2021.

74.    On multiple occasions, the Riches and WTAS made requests to Warne that he introduce the Riches and WTAS to customers and Growers that were promised would become customers of the Riches and WTAS, but Warne, having initially agreed to make the introduction, fraudulently promised to perform but ultimately refused to make the introductions.

75.    Either Warne knew Plaintiff's customers and Growers and was able to make an introduction, fraudulently promised to perform but refused to do so in furtherance of a scheme to defraud the Riches and WTAS and breach the contract; or Warne did not know Plaintiff's customers and Growers because they were sent to him by Wes Bradley and he had no personal or professional connection with them and fraudulently promised to make introductions.

76.    Warne and West Tenn. Air intentionally misstated material fact in their negotiations with the Riches to induce them into the Asset Purchase Agreement.  To Wes Bradley, a Nutrien Ag Solutions manager, Warne stated in May 2022 that he did not want to do the work of introducing the Riches to his customers.

14

77.     Notwithstanding Plaintiff and Warne's motive in failing to make an introduction between the Riches, WTAS, and customers, Plaintiff and Warne acted in a deliberate, fraudulent, and calculated manner to prevent or impede the Riches and WTAS from communicating or meeting with Growers that were in need of aerial application or crop spraying services making excuses such as "it wasn't a good time to meet them," and further refusing to provide contact information for the customers and Growers.

78.     Plaintiff and Warne acted in a deliberate and calculated and fraudulent manner to prevent or impede the Riches and WTAS from meeting, communicating with, or gaining exposure to Growers in need of aerial application or crop spraying services.

79.     Upon information and belief, Warne defamed and disparaged the Riches and WTAS to one or several Growers and Wes Bradley.

80.     Warne breached his obligations under the Consulting Agreement regarding the purported "exclusive" "on-call" contract between WTAS and Nutrien Ag Solutions.

81.     After a period of time, it became evident that many of the material statements, representations, or promises made by Plaintiff and Warne were false, misleading, deceptive, and were made despite knowing the same.

82.     Plaintiff and Warne did not have the customer base or size that was represented and warranted to the Riches and WTAS.

83.     Plaintiff and Warne asserted in May 2022 that the only source of business, customers, and income was Bradley, an employee of Nutrien Ag Solutions.

84.     Plaintiff and Warne misrepresented the nature of the relationship with Nutrien Ag Solutions.

85.    Wes Bradley has testified that there was no oral or written agreement for Nutrien or Wes Bradley to use West Tenn. Air as the exclusive, on-call provider of aerial application services between Nutrien Ag Solutions, Plaintiff and Warne.

86.    According to Warne there was only a business relationship with Wes Bradley who was Warne and Plaintiff's "go-to" provider of work, a fact that was fraudulently or negligently concealed from the Riches and WTAS.

87.    Warne did not provide or maintain the exclusive on call service or agreement with Nutrien Ag Solutions on behalf of the Riches and WTAS as called for in the Agreement.

88.    Plaintiff and Warne did not have the goodwill and going concern value or business or financial success that was represented and warranted or fraudulently and negligently represented to the Riches and WTAS either because they had only one customer or because they had no customers.

89.    West Tennessee Air Service was not a "turn key" business with guaranteed customers and collections as represented and warranted to the Riches and WTAS.

90.    Plaintiff and Warne admitted after the transaction closed that they were primarily, if not entirely, dependent on Bradley or farmers unknown to them.

91.    Upon information and belief, the provision in **Exhibit E** requiring the Riches and WTAS to compensate Kelli Bradley $0.50 per acre was a pre-requisite to obtaining business, customers, or work from Nutrien or work for Nutrien customers, and further that the compensation paid to Kelli Bradley was predominantly not for her performance of billing and collections.

92.    The provision in **Exhibit E** requiring the Riches and WTAS to compensate Kelli Bradley $0.50 per acre was, in effect, a kickback to keep and maintain the customers provided by and through Kelli Bradley's husband, Wes Bradley. Further, the true nature of this arrangement

16

was hidden and withheld from the Riches and WTAS, both to induce them to execute the APA and to deceive them during the performance of the APA.

93.     If the Riches had been informed of the true nature of the kickback relationship, they would not have purchased West Tennessee Air Service, or would have renegotiated the potential transaction or been able to potentially mitigate their loss.

94.     If there was any breach of the Asset Purchase Agreement on the part of the Riches and WTAS, it is only because the Asset Purchase Agreement was fundamentally premised on the kickback scheme written into the Asset Purchase Agreement by Williams, the true nature of which Williams withheld from the Riches and WTAS.

95.     Additionally, Plaintiff and Warne acted affirmatively to prevent the Riches and WTAS from gaining exposure for their business and from growing their customer base.

96.     As the Riches and WTAS were attempting to gain exposure for their business and grow their customer base, Plaintiff and Warne admitted that Bradley began greatly decreasing and terminating the aerial application business that he was sending the Riches and WTAS which caused a substantial decrease in revenue for the Riches and WTAS and damaged them.

97.     Plaintiff and Warne knowingly, fraudulently, recklessly, or negligently communicated false and/or disparaging statements to third persons (such as Wes Bradley, Ag Air Aircraft, Stan Hunter of Midcontinent Aircraft, Brad and Will Studdard and Sterling Edwards) that the Riches and/or WTAS were inept, last, going bankrupt, were closing WTAS or otherwise exiting the market, and that Warne had repurchased certain equipment, including a plane, from the Riches and WTAS.

98.     Plaintiff and Warne concealed from and/or negligently omitted disclosing to the Riches and WTAS that the plane they sold to the Riches and WTAS was known in the market as the "Nutrien plane."

99.     Plaintiff and Warne concealed from and/or negligently omitted disclosing to the Riches and WTAS that West Tennessee Air Service had no commercial identity in its market place.

100.    Plaintiff/Counter-Defendant and Warne knowingly, recklessly, or negligently communicated to the Riches and WTAS that Plaintiff/Counter-Defendant and Warne had a strong commercial reputation and substantial goodwill and going concern value in the market place when in fact he did not service the 70,000 acres as represented and did not have direct customer relationships with the farmers whose fields he was servicing.

101.    Plaintiff and Warne concealed their lack of goodwill by making statements that he had been "flying every acre" of approximately 70,000 acres of farm land for the last eight years and that he knew all of the farmers.

102.    Despite the Consulting Agreement's non-compete provisions, and upon information or belief, Warne directly or indirectly competed with the Riches and WTAS by soliciting or performing aerial application services or spraying and breached Warne's agreement by failing to maintain the represented "exclusive" relationship with Nutrien and by discouraging others from using the Riches and/or WTAS's services.

103.    On or about May 11, 2022, the Riches and WTAS executed an Asset Purchase Agreement with A&M Flying Service, Inc., William M. Moody and Kathryn Ann Moody for the tangible and movable assets of A&M Flying Service, Inc.  Simultaneously, the Riches, through Rich Family Enterprises, LLC, executed a Contract of Sale for the real property of William M. Moody and Kathryn Ann Moody.  (Together, the "Marty Moody Transaction").

18

104.    Williams represented the Riches and WTAS and another entity Rich Family
Enterprises in the Marty Moody Transaction.

105.    Williams failed to tell the Riches that by purchasing the tangible assets through
WTAS LLC, the tangible assets would become subject to the UCC lien prepared and filed by
Williams on behalf of Plaintiff and Warne in connection with the Asset Purchase Agreement.

106.    Plaintiff and Warne have asserted the UCC lien in this matter as to the assets
acquired pursuant to the Marty Moody Transaction.

**COUNT I**
**FRAUDULENT INDUCEMENT / FRAUD / INTENTIONAL MISREPRESENTATION /**
**FRAUDULENT CONCEALMENT**

107.    The Riches and WTAS restate all preceding paragraphs as though fully set forth
herein.

108.    Plaintiff and Warne who was acting as an agent or otherwise on behalf of Plaintiff,
and Williams knowingly, recklessly, or negligently made material and false, misleading, or
deceptive statements, representations, or promises to the Riches and WTAS regarding  West
Tennessee Air Service, including but not limited to: in the advertising, marketing, and soliciting
of West Tennessee Air Service; during negotiations with the Riches regarding the purchase/sale
of West Tennessee Air Service; and in the Asset Purchase Agreement itself.

109.    The statements, representations, or promises included, but are not limited to, that
West Tennessee Air Service was a "turn key business," that "all customers and collections
guaranteed from 3rd party," that "with 4 average years business will pay for itself," that the Riches
would acquire or otherwise service a certain, sizeable number of customers, that the Riches and
WTAS would receive a customer list and customer information, that the Riches and WTAS would
enjoy a continuation of the purported business success and revenue of West Tennessee Air Service,

19

and that the Plaintiffs would acquire or otherwise enjoy the benefit of West Tennessee Air Service and Warne's goodwill and reputation.

110.    Plaintiff and Warne, knowingly, recklessly, or negligently made statements, representations, or promises that were false, misleading, or deceptive with respect to their business experience, expertise, reputation, and goodwill.

111.    Plaintiff and Warne knew or should have known that the statements, representations, or promises elsewhere described in this Counterclaim were not in accord with actual facts and/or could not be realized or satisfied.

112.    Plaintiff and Warne made statements, representations, or promises elsewhere described in this Complaint with the intent or objective to induce the Riches and WTAS to agree to enter into the Asset Purchase Agreement and to deceive or mislead the Riches and WTAS.

113.    Plaintiff and Warne made statements, representations, or promises elsewhere described in this Counterclaim with an intent or objective that the Riches and WTAS would rely thereon in forming their interest in purchasing West Tennessee Air Service and inducing them to execute the Agreement.

114.    Williams breached fraudulently concealed her knowledge and understanding of the nature of the 50 cent/acre fee to hire Kelli Bradley.

115.    Williams is liable as Trustee of the Trust, which is the 99% member of Plaintiff, for the statements and misrepresentations made of which the Trustee had knowledge.

116.    The Riches and WTAS reasonably relied on statements, representations, or promises elsewhere described in this Counterclaim.

117.    The Riches and WTAS have suffered damages in the amount of $900,000 representing the price they paid for the non-existent goodwill, customer base, and going concern

20

of West Tennessee Air Service and other damages totaling $3,000,000.  The Riches and WTAS have suffered additional damages including attorney's cost and suit expenses.

## COUNT II
## NEGLIGENT MISREPRESENTATION AND CONCEALMENT
### (In the Alternative)

118.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

119.    Plaintiff and Warne supplied information to the Riches and WTAS regarding the assets and certain other aspects of West Tennessee Air Service.

120.    The information supplied by Plaintiff and Warne was false.  Such information includes, but is not limited to:

    a.    West Tennessee Air Service was a "turn key (sic) business," that "all customers and collections guaranteed from 3rd party," that "with 4 average years business will pay for itself," that the Riches and WTAS would inherit or otherwise service a certain, sizeable number of customers or acres, that Riches would receive a customer list and customer information, that the Riches and WTAS would enjoy a continuation of the purported business success and revenue of Warne and West Tennessee Air Service LLC, and that the Riches and WTAS would acquire or otherwise enjoy the goodwill, reputation, and experience of Warne and West Tennessee Air Service, LLC.

    b.    Plaintiff and Warne had an extensive customer base with farmers in their marketplace, and they had substantial goodwill and going concern value.

       c.      Plaintiff and Warne had or would provide to the Riches and WTAS an exclusive dealing contract with Nutrien Ag Services and maintain that relationship and conform to high standards of work and business ethics; and

121.    Plaintiff and Warne were negligent, reckless, or otherwise failed to exercise reasonable care in either obtaining the information that they communicated to the Riches and WTAS or in communicating the information to the Riches and WTAS.

122.    Plaintiff and Warne concealed information from the Riches and WTAS that they were obligated to disclose, including but not limited to:

       a.      West Tennessee Air Service and Warne had no independent commercial identity or independent relationship with the farmer's whose fields they were servicing and to the extent they were known, it was known as the "Nutrien plane"

       b.      West Tennessee Air Service and Warne had no goodwill or going concern value; and

       c.      West Tennessee Air Service and Warne were completely dependent upon Wes Bradley for all of their work or that Wes Bradley had no ability to direct farmers to the Riches and WTAS and/or there was not exclusive "on call" agreement between Nutrien Ag Solutions and/or Wes Bradley and Warne and Plaintiff.

123.    Plaintiff, Warne and Williams wrongly concealed from Plaintiff and the Riches that the contractual obligation to pay Kelli Bradley $0.50 per acre was not a bona fide agreement for her billing and collection services but rather was in whole or in part a kickback to secure and maintain referrals and customers from Nutrien and Wes Bradley.

124.    Williams is liable as Trustee of the Trust, which is the 99% member of Plaintiff, for the fraudulent statements and misrepresentations made of which the Trustee had knowledge.

125.    The Riches and WTAS justifiably relied on the information communicated and information concealed by Plaintiff and Warne and Williams in forming an interest in purchasing the assets of West Tennessee Air Service and in entering into the Asset Purchase Agreement.

126.    Had Plaintiff, Warne and Williams disclosed the information they concealed, the Riches and WTAS would not have executed the Asset Purchase Agreement for $1.8 million.

127.    The Riches and WTAS have suffered damages in the amount of $3,000,000 in connection with the price they paid for the non-existent goodwill, customer base, and going concern of West Tennessee Air Service.  The Riches and WTAS have suffered additional damages including attorney's cost and suit expenses.

## COUNT III
## BREACH OF CONTRACT

128.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

129.    The Asset Purchase Agreement entered into between the Riches and WTAS, and Plaintiff and Warne was obtained by fraud and misrepresentation.

130.    The Riches and WTAS complied with all of their obligations under the Agreement until they discovered Plaintiff's and Warne's fraudulent conduct and misrepresentations and breach of their obligations of good faith and fair dealing.

131.    The Riches and WTAS were otherwise excused from their obligations under the Asset Purchase Agreement upon the fraud or misrepresentation committed by Plaintiff and Warne.

132.    The Riches and WTAS were otherwise excused from their obligations under the Asset Purchase Agreement upon Plaintiff and Warne committing several material breaches of the Asset Purchase Agreement.

133.    The Plaintiff and Warne committed several material breaches of the Asset Purchase Agreement, including but not limited to:

a.    The terms or obligations under Section 1 of the Asset Purchase Agreement (titled "Purchase of Assets") and the terms or obligations under Exhibit D of the Asset Purchase Agreement by (titled "Bill of Sale and Assignment") by, among other things, failing to transfer goodwill, customer lists, customer information, and a trade name as represented and promised to the Riches and WTAS;

b.    The terms or obligations under Section 1 of **Exhibit E** of the Asset Purchase Agreement (titled "Consulting Services") by, among other things, failing to maintain vendor contracts with Nutrien Ag Solutions and other vendors of Plaintiff and the Riches and WTAS;

c.    The terms or obligations under Section 2 of **Exhibit E** of the Asset Purchase Agreement (titled "Standard Performance") by, among other things, failing to conform to high standards of work and business ethics, and failing to devote the hours necessary to ensure that the business of the Riches and WTAS continued to operate as efficiently and at the same capacity as West Tennessee Air Service, LLC (as represented);

d.    The terms or obligations under Section 7 of **Exhibit E** of the Asset Purchase Agreement  (titled "Noncompete, Nonsolicitation and Confidentiality Covenant") by, among other things, directly or indirectly competing with or frustrating the

24

business of the Third-Party Plaintiff's and causing, contributing to, or encouraging current suppliers or customers to sever or alter any existing relationship with the Riches and WTAS, and causing, contributing to, or encouraging prospective suppliers or customers to not engage with the Riches and WTAS.

e.      The terms or obligations under Section 7 of Consulting Agreement by, among other things:

    i.    Directly or indirectly soliciting and performing aerial application or spraying services within the geographic area described in Section 7, including but not limited to, soliciting and performing aerial application or spraying services on behalf of or for, among others, Nutrien Ag Solutions and/or Bradley;

    ii.   Directly or indirectly encouraging, causing, or attempting to cause suppliers or customers to alter or sever any existing relationship with the Riches and WTAS;

    iii.  Directly or indirectly encouraging, causing, or attempting to cause prospective customers to not engage the Riches and WTAS;

    iv.   Directly or indirectly disparaging or defaming the Riches and WTAS or their business generally.

f.      Failing to act in good faith in the performance of the terms and obligations of the Asset Purchase Agreement.

g.      Failing to act in good faith and deal fairly with the Riches and WTAS in the performance of the terms and obligations of the Asset Purchase Agreement.

25

134. Williams is liable as Trustee of the Trust, which is the 99% member of Plaintiff, for the breaches of contract by Plaintiff.

135. The Riches and WTAS have suffered damages as a result of the material breaches committed by Plaintiff and Warne in the amount of $900,000 in connection with the price they paid for the non-existent goodwill, customer base, and going concern of West Tennessee Air Service. The Riches and WTAS have suffered additional damages including attorney's cost and suit expenses and the cost of mitigation.

**COUNT IV**
**TORTIOUS INTERFERENCE**

136. The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

137. Plaintiff and Warne, at all relevant times herein, were aware of the existence of the Riches and WTAS's business relationships with their then-existing customers and the prospective relationship with Growers in Dyer, Gibson and Carroll Counties.

138. Plaintiff and Warne, at all times relevant herein, were aware of the existence of the Riches and WTAS's business relationship with Wes Bradley and Nutrien Ag Solutions.

139. Plaintiff and Warne intended to cause the termination of the business relationship between the Riches and WTAS and their current customers Growers, Wes Bradley, and Nutrien Ag Solutions.

140. Plaintiff and Warne intended to cause the termination of the business relationship so that Plaintiff and Warne could resume working for those customers, Wes Bradley, and Nutrien Ag Solutions.

141. Plaintiff and Warne caused the termination of the business relationship between the Riches and WTAS and their current customers Growers by communicating improper and untrue

26

statements to the customers, Growers, business vendors, and other third parties to destroy the Riches and WTAS's goodwill in the community.

142.    Plaintiff and Warne caused the termination of the business relationship between the Riches and WTAS and Wes Bradley and Nutrien Ag Solutions by breaching the terms of the Asset Purchase Agreement and Section 7 of the Consulting Agreement.

143.    As a result of Plaintiff and Warne's foregoing tortious acts, the Riches and WTAS lost the business of current customers, prospective Growers, Wes Bradley, and Nutrien Ag Solutions and was thereby injured.

**COUNT V**
**VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT**

144.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

145.    The Tennessee Consumer Protection Act ("TCPA"), codified at Tenn. Code Ann. § 47-18-101 *et seq*. was applicable at all times pertinent herein.

146.    Plaintiff and Warne violated the TCPA by causing likelihood of confusion or of misunderstanding as to the source or approval of West Tennessee Air Service's services and customers by fraudulently misrepresenting that there was an "exclusive" agreement with Nutrien Ag Solutions.

147.    Plaintiff and Warne violated the TCPA by causing confusion or misunderstanding as to West Tennessee Air Service's affiliation, connection or association with Nutrien Ag Solutions.

148.    Plaintiff and Warne violated the TCPA by representing that West Tennessee Air Service had the approval, status, affiliation, or connection with Nutrien Ag Solutions, which it did not have.

Case 1:23-cv-01132-STA-jay    Document 155    Filed 10/31/24    Page 28 of 37
PageID 1628

149.    Williams is liable as Trustee of the Trust, which is the 99% member of Plaintiff, for the breaches of the TCPA of which she had knowledge and in which she participated.

## COUNT VI
## WILLIAMS' BREACH OF FIDUCIARY DUTY - ASSET PURCHASE AGREEMENT

150.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

151.    At all times pertinent herein, Williams was counsel for Warne and Plaintiff in connection with the negotiation and execution of the Asset Purchase Agreement.

152.    On or about March 26, 2021, prior to conclusion of the execution of the Asset Purchase Agreement, Williams undertook the representation of the Riches.

153.    Williams did not document any limitations as to her representation of the Riches and WTAS.

154.    Williams did not expressly state to the Riches or WTAS any limitations on her representation of them.

155.    As counsel for the Riches, Williams had a fiduciary duty to act in the interest of the Riches.

156.    Williams knew or suspected that the West Tenn. Air's compensation of Kelli Bradley of 50-cents per acre to do billing and collection work for West Tenn Air was in whole or in part a kickback to Wes Bradley for hiring West Tenn Air to provide aerial application services to Nutrien customers.

157.    On or about March 31, 2021, according to Williams' sworn testimony, Williams witnessed or had a conversation with the Riches and Warne regarding the material terms of the Asset Purchase Agreement.

158. During that conversation, according to Williams' sworn testimony, Warne and/or Williams made statements intentionally misrepresenting the $0.50 per acre to be paid to Kelli Bradley for collections and billing, and representing it to be a material term.

159. At the time of the intentional misrepresentation, Williams knew that the true nature of the Kelli Bradley payment was a kickback scheme, that the scheme was not what had been represented to the Riches, and believed it to be "offensive."

160. At the time of the intentional misrepresentation, Williams wrongfully failed to communicate the true nature of the Kelli Bradley kickback scheme and allowed the Riches to believe the false and fraudulent explanation for the payment as communicated by Warne or Williams.

161. Williams' failure to communicate to her clients, the Riches, the true nature of the Kelli Bradley kickback scheme, despite knowing the same, was a breach of her fiduciary duty.

162. But for Williams' breach of her fiduciary duty by failing to advise the Riches of the kickback scheme, the Riches would not have executed the present Asset Purchase Agreement.

163. Williams breach of fiduciary duty is the proximate cause of damage to WTAS and the Riches in the amount of $3,000,000 for which Ashley & Arnold is vicariously liable.

## COUNT VII
## WILLIAMS' INTENTIONAL MISREPRESENTATION

164. The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

165. If Williams did not fail to correct Warne's intentional misrepresentation and she made the statements regarding the Kelli Bradley kickback scheme, then she is liable for intentional misrepresentation as well as breach of fiduciary duty.

166.    On or about March 31, 2021, according to Williams' sworn testimony, Williams participated in a conversation with the Riches and Warne regarding the material terms of the Asset Purchase Agreement.

167.    During the March 31, 2021 conversation, according to Williams' sworn testimony, Williams or Warne made statements intentionally misrepresenting the $0.50 per acre to be paid to Kelli Bradley for collections and billing, and representing it to be a material term.

168.    Williams knew that the true nature of the Kelli Bradley payment was a kickback scheme and believed it to be "offensive" and a kickback

169.    Williams wrongfully and intentionally misrepresented to the Riches the true nature of the Kelli Bradley kickback scheme to induce the Riches to complete the Asset Purchase Agreement.

170.    The Riches relied upon the representation of Williams in completing the Asset Purchase Agreement.

171.    The Riches suffered injury as a result of Williams' intentional misrepresentation in the amount of $3,000,000 for which Ashley & Arnold is vicariously liable.

## COUNT VIII
## WILLIAMS' BREACH OF FIDUCIARY DUTY - MARTY MOODY TRANSACTION

172.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

173.    Williams, as counsel for Warne and Plaintiff, prepared and filed a UCC lien on the assets of WTAS in connection with the Asset Purchase Agreement that applied to "all assets" of WTAS including "any additions or replacements."

174.    Williams subsequently represented the Riches and WTAS as counsel in the acquisition of assets sold to them by Marty Moody.

30

175.     Williams failed to advise the Riches and WTAS that assets purchased from Marty Moody would be subject to the UCC lien she prepared and filed on behalf of Warne and Plaintiff, and that Warne and Plaintiff would challenge the sale of assets subject to the UCC lien.

176.     Williams further failed to advise the Riches and WTAS that UCC liens are negotiable with the lienholder and, therefore, the Riches and WTAS lost any opportunity to renegotiate the lien with Plaintiff and Warne prior to this lawsuit.

177.     Williams failed to advise the Riches and WTAS that they could have purchased the tangible assets in the Marty Moody Transaction through Rich Family Enterprises, thus avoiding the UCC lien.

178.     Although it was in the Riches and WTAS's best interest to know of the extent of the UCC lien, their lack of knowledge benefited Williams, Warne, and Plaintiff.  It benefited Plaintiff, as Plaintiff was the lienholder.  The Trust and Warne benefited, as the members of Plaintiff.  Williams benefited as the Trustee of the Trust, which would have additional assets from which she could incur and pay trustee fees.

179.     Through the acts and omissions described above, Williams breached her fiduciary duty to the Riches and WTAS and damaged them for which Ashley &Arnold is vicariously liable. The full extent of damage is unknown at this time.

## COUNT IX
## AIDING AND ABETTING AS TO WILLIAMS

180.     The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

181.     Williams, as legal counsel for the Trust, Warne, and Plaintiff knew that Warne intended and was in fact perpetuating a fraud on the Riches.

182.     As described herein above, Williams gave substantial assistance and encouragement to Warne and Plaintiff in the perpetuation of their fraud and wrongdoing.

183.     Williams actively aided and abetted Warne and Plaintiff's intentional misrepresentation, fraudulent concealment, and breach of contract which damaged WTAS and the Riches in the amount of $3,000,000 for which Ashley & Arnold is vicariously liable.

## COUNT X
## LEGAL MALPRACTICE

184.     The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

185.     On or about March 26, 2021, prior to conclusion of the execution of the Asset Purchase Agreement, Williams undertook the representation of the Riches, without any limitation.

186.     Williams breached professional duties that she owed to the Riches and WTAS, including but not limited to:

a.   The duty to act competently to communicate the scope of the attorney-client relationship or to act competently to decline representation of the Riches;

b.   The duty to obtain informed consent in writing from the riches as to the currently conflict of interest between the Riches, WTAS, West Tennessee Air Service, and Warne;

c.   The duty to communicate with the Riches to the extent reasonably necessary to permit the Riches to make informed decisions regarding the representation;

d.   The duty to disclose to the Riches that a currently client, Warne and Plaintiff, were committing a fraud that was reasonably certain to result in substantial injury to the Riches in furtherance of which Warne and Plaintiff were using Williams' services;

e.   Duty to not acquire a pecuniary interest adverse to a client, which Williams acquired when she became Trustee of the Trust which is the 99% member of West Tennessee Air Service, that is the Plaintiff herein;

f.   Williams conduct damages WTAS and the Riches in the amount of $3,000,000

187.    Duty to not communicate about the subject of the representation with the Riches, whom she knew were represented by another lawyer.

188.    Williams' conduct damaged WTAS and the Riches in the amount of $3,000,000 for which Ashley & Arnold is vicariously liable.

## COUNT XI
## LIABILITY OF ASHLEY & ARNOLD

189.    The Riches and WTAS restate all preceding paragraphs as though fully set forth herein.

190.    Williams is an employee and/or owner of the unincorporated association doing business as Ashley & Arnold.

191.    Ashley & Arnold had actual or constructive knowledge of Williams' wrongdoing, including but not limited to:

a.   Her breach of fiduciary duty with respect to the Kelli Bradley kickback scheme;

b.   Her professional negligence and malpractice with respect to the representation of the Riches and WTAS;

c.   Her breach of fiduciary duty with respect to the Marty Moody transaction; and

d.   Her aiding and abetting of the fraud and breach of contract of Plaintiff and Warne.

192.    Ashley & Arnold is vicariously liable for the acts of Williams.

33

## JURY DEMAND

The Riches and WTAS hereby demand trial by jury of all issues in this case so triable.

## <u>DAMAGES</u>

193.    The Riches and WTAS have suffered damages in an amount not less than $3,000,000, and additional other damages, its attorney's fees and costs.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Riches and WTAS respectfully request that this Court enter a judgment in their favor against Plaintiff/Counter-Defendant West Tennessee Air Service LLC ("Plaintiff"), Counter-Defendant and Third-Party Defendant Monte Warne ("Warne"), Counter-Defendant and Third-Party Defendant Marianna "Molly" Williams ("Williams"), and Counter-Defendant and Third-Party Defendant Ashley & Arnold ("Ashley & Arnold"), jointly and severally, as follows:

1. Plaintiff and Warne are liable for fraud, fraudulent inducement, intentional misrepresentation and fraudulent concealment relating to the Asset Sale Agreement and the Promissory Note for the $900,000 of "Goodwill and going concern" and all of the WTAS and Riches' damages in the amount of $3,000,000.

2. In the alternative, Plaintiff and Warne are liable for all damages to the Riches and WTAS proximately caused by their negligent misrepresentation and concealment in an amount not less than $3,000,000.

3. Plaintiff and Warne are liable for violations of the Tennessee Consumer Protection Act to the Riches and WTAS.

4. Plaintiff and Warne are liable for breach of contract as to the Asset Sale Agreement and Promissory Note for the $900,000 of "Goodwill and going concern."

5. Warne is liable for breach of the "Consulting, Non-Compete and Confidentiality Agreement with Monte Warne" contract as to the Asset Sale Agreement and Promissory Note for the $900,000 of "Goodwill and going concern."

6. Plaintiff and Warne are liable to the Riches for tortious interference with business relationships in an amount to be proven at trial but not less than $3,000,000.

7. The Trust is liable as the 99% member of Plaintiff, by and through the Trustee for all damages of which Plaintiff is liable.

8. The Riches and WTAS are entitled to partial rescission or reformation of the Promissory Note reflecting the $900,000 of "Goodwill and going concern," or in the alternative, rescinding the Asset Purchase Agreement in its entirety.

9. Plaintiff and Warne shall repay to the Riches and WTAS all sums paid under the Promissory Note.

10. The Riches and WTAS shall have no further obligations or duties under the Promissory Note and the Promissory Note shall be cancelled.

11. Warne is promissorily estopped from interfering with WTAS's suppliers, customers, or prospective customers, and this Court should enter an order enjoining and prohibiting him from taking any such action.

12. Williams and Ashley & Arnold are liable to the Riches and WTAS for all damages caused by their professional negligence, breach of fiduciary duty, intentional misrepresentation, and aiding and abetting of Warne and Plaintiff in their fraudulent scheme and breach of contract, in an amount to be proved at trial but not less than $3,000,000.

13. In the event that the Riches or WTAS are found to be liable for breach of contract or any other damages to Plaintiff, Williams, and Ashley & Arnold are liable to the Riches and WTAS for the same.

14. Plaintiff, Warne, Williams, and Ashley & Arnold are liable to the Riches and WTAS for punitive damages.

15. Plaintiff and Warne are liable to the Riches and WTAS for treble damages and attorney's fees under the Tennessee Consumer Protection Act.

16. Award to the Riches and WTAS prejudgment interest and post-judgment interest, their reasonable attorney's fees, court costs, expenses, and all such other relief as may appear proper from the premises.

Respectfully submitted,

*s/Cannon F. Allen, Sr.*
Cannon F. Allen, Sr. (BPR No. 12548)
John D. Woods III (BPR No. 35791)
Annabelle P. Harris (BPR No. 37684)
ADAMS AND REESE LLP
6075 Poplar Avenue, Suite 700
Memphis, Tennessee 38119
Telephone: (901) 525-3234
Facsimile: (901) 524-5419
Cannon.Allen@arlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify a true and exact copy of the foregoing was served this 31st day of October, 2024 via the Court's CM/ECF filing system, on the following:

W. Lewis Jenkins, Jr. (#017423)
Dean P. Dedmon (#017949)
Jenkins Dedmon Law Group LLP
426 Troy Avenue, P.O. Box 84
Dyersburg, TN 38025

Richard Glassman
Edwin E. Wallis III
Brian Garrott
Glassman, Wyatt, Tuttle and Cox
26 N. Second Street
Memphis, TN 38103

G. Coble Caperton
Rice Caperton Rice, PLLC
275 Jefferson Avenue
Memphis, TN 38103

*s/Cannon F. Allen, Sr.*
Cannon F. Allen, Sr.