## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

**WEST TENNESSEE AIR SERVICE, LLC,**

          **Plaintiff/ Counter-Defendant,**

**vs.**                                   **No. 1:23-cv-1132-STA-jay**

**WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,**

          **Defendants/Counter-Plaintiffs.**


**WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,**

          **Third-Party Plaintiffs,**

**vs.**

**MONTE WARNE; MARIANNA WILLIAMS,
Individually; and ASHLEY & ARNOLD,
a partnership,**

          **Third-Party Defendants.**

---

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
## MOTION FOR SUMMARY JUDGMENT OF
## MARIANNA WILLIAMS AND ASHLEY & ARNOLD
## AND PARTIALLY GRANTING AND PARTIALLY DENYING
## MOTION FOR SUMMARY JUDGMENT OF
## WTAS LLC, KYLE E. RICH, AND MELODY L. RICH AS TO
## MARIANNA WILLIAMS AND ASHLEY & ARNOLD

---

Plaintiff West Tennessee Air Service, LLC ("West Tennessee Air") filed this action in state

court asserting a claim for breach of contract by WTAS, LLC and Kyle and Melody Rich.

Defendants removed the action to this Court with jurisdiction predicated on diversity of

citizenship, 28 U.S.C. § 1332. Defendants then filed a third-party complaint against Monte Warne, the former owner of West Tennessee Air.  On April 19, 2024, the Court granted Defendants/Third-Party Plaintiffs' motion to amend the third-party complaint. The Court allowed Defendants/Third-Party Plaintiffs to bring claims against Marianna (Molly) Williams, individually; Marianna Williams, as Trustee of the Meredith Z. Warne Family Trust;[1] and Ashley & Arnold, Williams' employer;[2] and to assert new claims against Monte Warne. Defendants/Third-Party Plaintiffs filed the operative Amended Consolidated Counterclaim/Third-Party Complaint on October 31, 2024. (ECF No. 155.)

Subsequently, Williams and Ashley & Arnold filed a motion to dismiss the Amended Consolidated Counterclaim/Third-Party Complaint on statute of limitations grounds.  The Court denied that motion on March 31, 2025. (ECF No. 225.) Williams and Ashley & Arnold have now filed a motion for summary judgment (ECF No. 253), and WTAS, Kyle Rich, and Melody Rich ("Defendants/Third-Party Plaintiffs") have filed a motion for partial summary judgment. (ECF No. 255.)[3] The cross-motions have been fully briefed and are ready for a decision. For the reasons set forth below, the motions for summary judgment are **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

---

[1] On July 23, 2024, the Court granted the motion to substitute Thomas Baker Miller as the trustee for the Meredith Z. Warne Family Trust. (ECF No. 124.) The claims against the Trustee have now been dismissed. (ECF No. 226.)

[2] Although the third-party complaint describes Ashley & Arnold as a partnership, that entity has clarified that it is a sole proprietorship. Its status as a partnership or as a sole proprietorship is not relevant to the Court's decision on this motion. The parties agree that the only basis for liability of the law firm is vicarious liability through the actions of Williams.

[3] Also pending are a motion for partial summary judgment filed by Defendants/Third-Party Plaintiffs against West Tennessee Air and Monte Warne (ECF No. 254) and a cross-motion for summary judgment filed by West Tennessee Air and Warne against Defendants/Third-Party Plaintiffs. (ECF No. 258.) Those motions are not addressed in this order.

## Background

This dispute relates to the purchase of West Tennessee Air's crop-dusting business assets by Defendants/Third-Party Plaintiffs. Throughout the purchase transaction, the Riches were represented by Benjamin M. Lange, counsel in Iowa, while Williams represented West Tennessee Air. To purchase the assets of West Tennessee Air, the Riches, with the assistance of Williams at the request of Lange, formed WTAS, LLC, a Tennessee limited liability company. During the formation of WTAS, Defendants/Third-Party Plaintiffs allege that Williams "undertook or created the appearance if not the fact of having undertaken a general representation of the Riches with respect to the negotiation of the [purchase transaction]." (Amd. 3rd Party Cmplt. ¶ 52, ECF No. 155.) Defendants/Third-Party Plaintiffs have brought claims against Williams for fraudulent inducement/fraud/intentional misrepresentation/fraudulent concealment (Count I); negligent misrepresentation and concealment (Count II); breach of fiduciary duty - APA (Count VI); intentional misrepresentation (Count VII); breach of fiduciary duty - Marty Moody Transaction (Count VIII); aiding and abetting (Count IX); and legal malpractice (Count X). The Riches allege that Ashley & Arnold is vicariously liable for the acts of Williams.

Williams and Ashley & Arnold seek summary judgment on all claims brought against them, while Defendants/Third-Party Plaintiffs seek partial summary judgment in connection with some of the elements of their claims against Williams and Ashley & Arnold.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the non-moving party and must draw all reasonable

inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Statement of Undisputed Material Facts</u>

Pursuant to the Local Rules of this Court, the parties have prepared statements of material facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Each party has responded to the movant's statement and has submitted statements of additional facts. These additional facts have been responded to.

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). The non-moving party must respond to the movant's statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, the non-movant may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If the non-movant asserts that a genuine dispute of material fact exists, it must support its contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court has disregarded any inadmissible evidence in making its decision. The parties may renew any pertinent objections at trial. The Court finds that there is no genuine dispute as to

the following facts unless otherwise noted.[4]

This case arises from a transaction in which WTAS, LLC, owned by Kyle and Melody Rich, purchased certain assets from West Tennessee Air Service, LLC.

West Tennessee Air was a crop-dusting company operated by Monte Warne. Warne was the President of, pilot for, and 1 % owner of West Tennessee Air. The remaining 99% was owned by the Meredith Z. Warne Family Trust.

West Tennessee Air began operations in December 2019, when Warne, acting on behalf of West Tennessee Air, purchased all the assets of West Tennessee Ag Service, LLC for $555,000; the assets included an airplane, an auger truck, and a semi-truck. West Tennessee Ag was a crop-dusting business owned by Holt and Hedrick Shoaf and Jimmy Hargett.  The purchase price did not include a specific allocation for goodwill. That is, even though some goodwill may have been transferred at the time of the sale between West Tennessee Ag Service and West Tennessee Air, there was not a specific line item in the closing paperwork.

Beginning in January 2021, the Riches, Warne, and West Tennessee Air, by and through Warne, engaged in discussions regarding all aspects of West Tennessee Air and began to negotiate an agreement for the Riches (and eventually WTAS) to purchase, among other things, the trade name "West Tennessee Air Service," goodwill, going concern, equipment, customer files, customer information, billing information, pricing information, and advertising and promotion material.

---

[4] The parties also state that some facts are disputed only for the purpose of the Court's deciding the motion for summary judgment. At other times, a party has noted that a particular statement does not contain material facts that must be decided in order to resolve any substantive claim or defense but concedes that the statement is undisputed for purposes of ruling on the parties' competing motions for summary judgment.  All facts are stated for the purpose of deciding these motions only.

The purchase transaction was initially to be effectuated by a Membership Interest Purchase Agreement ("MIPA"). Days before the scheduled closing date, the Riches decided to use an Asset Purchase Agreement ("APA") vehicle for purchasing West Tennessee Air's assets rather than a MIPA. On March 23, 2021, the Riches and Warne agreed to change the transaction to an asset purchase. The switch to the APA from the MIPA required the Riches to create WTAS, a new LLC, to serve as the acquiring entity.

On February 10, 2021, Warne sent an email to himself with his thoughts on the transaction. Warne engaged Williams to represent him and West Tennessee Air on or about February 11, 2021. No engagement letter has been produced by Williams or Ashley & Arnold or Warne.

Williams initially prepared an MIPA on or about February 19, 2021, between Warne and West Tennessee Air and the Riches, that incorporated Warne's ideas contained in his February 10, 2021 email to himself. She sent the draft to Michael Gauldin, then Trustee of the Meredith Z. Warne Family Trust.

Williams testified in her deposition that, from her initial meeting with Warne in early February 2021, she knew that there was no existing contract between West Tennessee Air and Nutrien. She made a handwritten note dated March 2, 2021, "Nutrien – no contract."

On or about February 23, 2021, Williams sent the MIPA draft documents to the Riches. The Riches responded to Williams and notified her they had a lawyer to represent them – Ben Lange.

The original and all subsequent versions of the transaction documents contained a Consulting, Non-Competition and Non-Solicitation Agreement ("Consulting Agreement") that would become Exhibit E to the transaction documents ultimately executed by Warne.  The Consulting Agreement provided that Monte Warne would "[w]ork with managers of Nutrien Ag Solutions to maintain vendor contract with WTAS to provide exclusive service as 'on call' provider for work as needed."

The first version of the APA was prepared by Ben Lange, the Riches' Iowa attorney. Lange emailed Williams on March 25 and provided the APA that he had drafted. He remarked, in part, "My client is coordinating with their accountant on a new LLC, and where it will be formed. So where you see [an entity to be named later] it's just because we haven't sorted out the name yet."

The Riches were the sole members of the newly created Tennessee limited liability company named WTAS, LLC, which was the buyer in the transaction. The WTAS Operating Agreement was drafted by Williams, an attorney at the law firm of Ashley & Arnold. Kyle Rich and Melody Rich were the two members of WTAS.

The Riches, WTAS, West Tennessee Air, Monte Warne, and Michael Gauldin, as Trustee of the Merdith Z. Warne Family Trust, executed the APA on March 31, 2021.

Williams had represented Warne several times, beginning in the 1980s. Williams represented Warne in the sale of West Tennessee Air to the Riches, and, after the sale on March 31, 2021, she became the trustee of the Merdith Z. Warne Family Trust on April 12, 2021. Gauldin was a "backup" Trustee after the prior Trustee died; Williams became Trustee because Gauldin did not intend to be the permanent Trustee.

The Riches worked together. Kyle Rich was the President, and Melody Rich was the Secretary and Treasurer. The duties of the President and Secretary are described in the WTAS Operating Agreement. The President is the "principal executive manager" of the Company. The President "shall supervise, direct generally, and conduct all of the business affairs of the Company."

Kyle Rich has been involved in the aerial application (a/k/a crop-dusting) business and farming all his adult life. The Riches have owned and operated a crop-dusting business in Iowa for more than thirty-five years. Kyle Rich started agricultural flying in 1990 and has operated primarily in Iowa since 1991.

The Riches have an adult son, Kaleb Rich, who was learning how to fly crop-dusting airplanes and who was to be part of the WTAS operation in Tennessee. Kaleb attended Epic Flight Academy in Florida. The program was approximately a year and a half. He had hundreds of hours of flight time when he began working for WTAS. Wes Bradley and Warne were aware of Kaleb's experience and qualifications and approved of his abilities as a pilot. In February of 2021, before they executed the APA, the Riches made a trip from Iowa to Dyersburg. The purpose of the trip was to introduce Kaleb to Wes Bradley.

As part of their due diligence, the Riches inspected the equipment purchased, spoke to Monte Warne and to Wes Bradley, and used the financial statements and performance of West Tennessee Ag and West Tennessee Air to evaluate the customer base.

Before they executed the APA, the Riches did not ask to see Warne's customer lists; Warne agreed to supply the lists post-closing. They did ask to see West Tennessee Air's financial statements and the financial statements of West Tennessee Ag to support their understanding that West Tennessee Air and Warne had a substantial customer base.

The Riches understood that Warne did not have written contracts with customers; instead, they understood that West Tennessee Air and Warne had performed services for its customers through oral contracts and that Warne had been running West Tennessee Ag and West Tennessee Air for their entire existence. They believed that Warne had an exclusive service contract with an agricultural company named Nutrien Ag Solutions.

Wes Bradley, at all times material, worked for Nutrien. The Riches knew, before executing the APA, that Wes Bradley was a manager for Nutrien. Wes Bradley, at all times material, was married to Kelli Bradley. The Riches knew, before executing the APA, that Wes Bradley was married to Kelli Bradley.

9

The Riches knew, before executing the APA, that Kelli Bradley did the bookkeeping/invoicing for West Tennessee Air and was paid $0.50 per acre by West Tennessee Air for her services.[5] The Riches needed someone to do the billing and collections for WTAS, and they found nothing improper or unreasonable about paying $0.50 per acre for those services as long as the person performing the services was doing a good job.

After the execution of the APA, the Riches paid Kelli Bradley $0.50 per acre to do their billing and collections. In September, the Riches changed their agreement with Kelli Bradley and paid her to do billing and collections for Nutrien customers only. Melody Rich began to do the billing and collections for the non-Nutrien accounts.

Approximately 50% of West Tennessee Air's customers were also Nutrien customers. Nutrien customers went through Wes Bradley, and Nutrien guaranteed payment to the crop-duster regardless of whether the grower paid.

In 2022, Kelli Bradely did some invoicing for WTAS, as well as for Nat Crenshaw/Ariel Solutions. By the end of 2022 and for the entirety of 2023, Kelli Bradley did not provide invoicing services for any aerial applicator.

Wes Bradley, for Nutrien, used Aerial Solutions to provide crop-dusting service for its customers from September 2022 through March 2023. At that point, Bradley began using Monte Warne exclusively until the end of October 2023. In November 2023, Bradley apparently engaged Aerial Solutions again.

---

[5] The parties dispute whether Kelli Bradley received this money strictly for bookkeeping services or whether the payment was in the nature of a "kickback." They also dispute whether Williams believed that the money was a kickback.

In 2020, another crop-dusting outfit began working from the same air strip that WTAS started using when it became operational in 2021. WTAS denies knowing, at the time of executing the APA, that another crop-dusting operator was using the air strip.

With the exception of one request on August 10, 2022, WTAS did all of the work requested by Wes Bradley through July 2022. The Riches declined that job because they already had another job scheduled for the day and they believed that the requested job from Wes Bradley was not safe. Additionally, the job was eighty miles from WTAS's location in Dyersburg, Tennessee.

Although Bradley testified that he stopped using WTAS because the Riches turned down a job in August 2022, he also testified that the Riches did "good work" and he did not have any problem with the quality of their performance nor was he unsatisfied which their performance.

The Riches are not aware of anybody in the agricultural business that has a written contract that obligates them to use a particular crop-dusting company. The Riches have never had a written contract with any customer that obligates the customer to use the Riches' crop-dusting company.

Before the Riches signed the APA, they knew that any prior customers of West Tennessee Air had the right to choose which aerial spray company to use for their crop-dusting needs. Kyle Rich agreed that "[a] customer can use you or if they choose to send you down the road . . . ."

Beginning in February 2021, Williams was acting on behalf of West Tennessee Air and Warne as counsel with respect to the negotiations related to the purchase transaction. The Riches knew that Williams was representing West Tennessee Air and Warne as counsel with respect to those negotiations.

In February and March 2021, the Riches were represented by Iowa attorney Ben Lange with respect to negotiations related to the purchase transaction. Ben Lange was still the Riches' lawyer when Williams was asked to create the Tennessee LLC that would become WTAS.

11

Like the Riches, Williams understood that, when it comes to hiring a crop-duster, "farmers can hire whoever they want."

Although Warne never told Williams that paying Kelli Bradley to do invoicing was a prerequisite for WTAS getting Nutrien business from Wes Bradley, Williams testified that Warne told her "that he had that arrangement" - meaning that he paid Kelli Bradley to do bookkeeping and collection work. Williams assumed that, if WTAS was going to get referrals from Nutrien, they had to pay Kelli Bradley $0.50 an acre. Williams believed that the Riches knew that West Tennessee Air's goodwill was contingent on payments to Kelli Bradley.

Williams further testified that she did not approve of Warne and the Bradleys' arrangement and described her thinking. "What went through my mind is that I find certain business practices related to the agricultural industry offensive, including the fact that you pay people to do stuff for you. But I know that it happens. I know that it happens all the time."

Williams assumed that the Riches understood what they were buying because they had been in business in Iowa and seemed to be successful and intelligent. "As far as what they were doing, do I personally think that's a good thing? No. But I've come, as I said, to be used to the standard in the industry being not necessarily what I would think was appropriate to do."

The Riches thought that the agreement to hire Kelli Bradley was a bona fide agreement.

Williams knew that West Tennessee Air did not have an exclusive service agreement with Nutrien.

Warne informed the Riches that Wes Bradley "is not going to like not getting his cut" through payments to Kelli Bradley after the Riches took over billing for non-Nutrien customers.

Williams did not send the Riches an "I am not your lawyer letter," nor did she conclude the services she provided to the Riches after the transaction closed. She sent the Riches two invoices for her professional services, dated May 13, 2021, and August 10, 2021.

Williams served as the agent for service of process for WTAS for a limited time. She assisted the Riches with a second transaction in April 2022, in which the Riches purchased aerial application assets from Marty Moody. At the same time, she served as the trustee of the Family Trust.

<u>Analysis</u>

Defendants/Third-Party Plaintiffs allege, *inter alia*, that Williams was negligent in advising and fraudulently inducing them to enter into the APA. Specifically, Williams allegedly fraudulently represented that West Tennessee Air had an "exclusive vendor contract" with nonparty Nutrien, even though no such contract existed. Additionally, Williams negligently failed to disclose the true nature of West Tennessee Air's relationship with Nutrien. This relationship allegedly involved a "kickback scheme" wherein West Tennessee Air agreed to pay Kelli Bradley $0.50 per acre for billing and collection services in exchange for referrals of Nutrien customers and business to West Tennessee Air by Kelli Bradley's husband, an employee for Nutrien. As noted above, the parties have filed cross-motions for summary judgment.

Williams presents several grounds in support of her motion. She contends that she was not the attorney for the Riches during the transaction and, instead, provided "ministerial" services only. She also denies making any misrepresentations or fraudulent statements to them. According to Williams, she made no representation of any material facts to the Riches, and, if she withheld anything, it was a mere opinion that she had no duty to disclose. She claims that the Riches' co-extensive knowledge as to the contents of the APA and its attachments, the absence of written

13

contracts, as well as the relationship with Kelli and Wes Bradley, negates the reasonable reliance element of the misrepresentation claims.

Williams reasserts her statute of limitations defense on all claims except the fraud claim. She argues that the Riches knew or should have known, on or before January 6, 2023, of their injury and that the injury was caused, at least in part, by Williams' alleged breach of duty/failure to disclose.

She further argues that there is no evidence to support the aiding and abetting claim because inaction is not sufficient to support this claim. She also asks for judgment as a matter of law on the claim for punitive damages.

Additionally, she moves for summary judgment on the affirmative defenses of comparative fault, waiver, estoppel, ratification, and acquiescence. According to Williams, the Riches went into the transaction with their "eyes wide open" and with knowledge of the same facts known to Williams.

Defendants/Third-Party Plaintiffs have moved for partial summary judgment, primarily on the issue of whether Williams represented them during parts of the transaction, and whether that representation created a *per se* fiduciary duty. Underlying all of Defendants/Third-Party Plaintiffs' claims is the issue of whether they had an attorney/client relationship with Williams during the purchase transaction. Therefore, the first issue the Court must decide is whether either party has presented undisputed facts showing that Williams (and Ashley & Arnold vicariously) was or was not the attorney for the Riches during the purchase transaction.

In support of her argument that she was not their attorney, Williams points to the fact that the Riches had an attorney in Iowa who represented them throughout the negotiations. She also distinguishes between her actions in helping the Riches form the entity that was needed to complete

14

the transaction as opposed to actually helping with the negotiations and purchase of the assets of West Tennessee Air. She describes her actions in the formation of WTAS as "ministerial."

In rebuttal, Defendants/Third Party Plaintiffs point to unrefuted evidence in the record that Williams represented West Tennessee Air and Warne during the transaction creating WTAS's articles of organization, while also obtaining WTAS's EIN, drafting WTAS's operating agreement, discussing her work with the Riches outside the presence of their Iowa attorney, and invoicing the Riches for her "professional services" in her representation of them. Moreover, Williams admittedly did not tell the Riches that she was not their lawyer either verbally or in writing and did not set out the scope of her representation.

The Tennessee Supreme Court set out factors to be considered in determining whether an attorney-client relationship has been established in *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014).

> "The attorney-client relationship is consensual and, significantly, it 'arises only when both the attorney and the client have consented to its formation.'" *Akins v. Edmondson*, 207 S.W.3d 300, 306 (Tenn. Ct. App. 2006) (quoting *Torres v. Divis*, 144 Ill. App.3d 958, 98 Ill. Dec. 900, 494 N.E.2d 1227, 1231 (1986)). An attorney-client relationship does not arise unless the potential client has a reasonable expectation that the lawyer is willing to assent to the formation of the relationship. *See* Tenn. Sup.Ct. R. 8, RPC 1. 18, cmt. 2 ("Duties to Prospective Client") (explaining that "a person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, is not a 'prospective client'...."); *see also Togstad v. Vesely*, 291 N.W.2d 686, 693 n. 4 (Minn. 1980) (stating that an attorney-client relationship arises when a person "seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice") (citations omitted) (internal quotation marks omitted). Restatement (Third) of the Law Governing Lawyers, Section 14, similarly states:
>
> A relationship of client and lawyer arises when:
>
> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
> (a) the lawyer manifests to the person consent to do so; or
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

(2) a tribunal with power to do so appoints the lawyer to provide the services.

*Restatement (Third) of the Law Governing Lawyers* § 14 (2000).

*Jackson*, 444 S.W.3d at 599-600.

In this case, it is undisputed that Williams consented to perform legal work for the Riches – legal work that was necessary to complete the purchase transaction – and did, in fact, perform that work. She communicated with Melody Rich not in the presence of her Iowa attorney, received a fee for her services, and, most important, she never told the Riches that she was not acting as their attorney. *C.f.*, *Jackson*, 444 S.W.3d at 601 ("In light of Ms. Dix's repeated statements to Defendant that she was not acting as her attorney, the trial court's finding that Defendant had no reasonable belief or expectation that Ms. Dix had assented to the formation of an attorney-client relationship is not clearly erroneous.")

Williams explains that she assisted with the formation of WTAS because the Riches decided at the last minute that they needed an APA rather than an MIPA. According to Williams, "This change to an Asset Purchase Agreement ('APA') from a MIPA was critical as it required a completely new Tennessee entity to be formed. March 23, 2021, was a Tuesday, and the closing was that coming Monday. This was truly the eleventh hour." (Williams Memo. p. 4, ECF No. 253-1.) She also notes that Ben Lange continued to represent the Riches and asked for her help with the formation of WTAS and other "ministerial" related actions. While this proffered rationale may help explain why Williams undertook her actions, it does not negate the fact that Williams formed an attorney-client relationship with the Riches during the transaction (and as part of the transaction) by performing legal work for them that was never limited in scope by her. Because there are no disputed issues of material fact, the Court finds for Defendants/Third-Party Plaintiffs on the issue of Williams' legal representation of them as a matter of law.

As correctly noted by Defendants/Third-Party Plaintiffs, Tennessee law recognizes the relationship between attorney and client as a *per se* fiduciary relationship. *Atchison v. Hubbell Industrial Controls, Inc.*, 2025 WL 1008559, at *12 (M.D. Tenn. April 1, 2025) (citing *Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 49 (Tenn. Ct. App. 2019)). Therefore, the Court finds, as a matter of law, that Williams was in a fiduciary relationship with the Riches. *Id.* Thus, as between her and the Riches, Williams "must deal with them with the utmost good faith." *Alexander v. Inman*, 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995). "The fiduciary relationship arises when a client first consults an attorney and extends to all dealings between the attorney and the client . . . ." *Id.* (citing *Cummings v. Patterson*, 442 S.W.2d 640, 643 (1968)). Affirmative duties owed by fiduciaries include "full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading clients." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (citation omitted).

Because Williams was the Riches' fiduciary, she owed them certain duties, including the duty to disclose all material facts and take reasonable care to avoid misleading the Riches. However, whether she did, in fact, breach those duties and whether the alleged injuries suffered by Defendants/Third Party Plaintiffs were caused by that breach present disputed issues of fact. *See In re Est. of Potter*, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) ("In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach.")

The claims of Defendants/Third-Party Plaintiffs rest primarily on their allegations that the arrangement between Warne and Kelli Bradley was a "kickback" scheme, Williams knew that it was a kickback scheme prior to the completion of the transaction, she had a duty to inform

17

Defendants/Third-Party Plaintiffs of such but did not do so, and this failure resulted in their buying West Tennessee Air without having the benefit of this knowledge. Also central to their claims is the allegation that Williams knew that West Tennessee Air did not have an exclusive contract with Nutrien but failed to inform them of such. According to Defendants/Third-Party Plaintiffs, Williams' failure to adhere to her duty of utmost good faith and fair dealing, candor, and loyalty led to their executing the APA which ultimately led to their purchase of West Tennessee Air and their injuries in not getting what they bargained for.

The parties have presented competing interpretations of various statements that Williams made during her deposition as to these issues, thus creating a disputed issue of fact as to Williams' knowledge of the alleged misrepresentations. According to Williams, she "expressly testified she did not at any time believe that paying Ms. Bradley to do invoicing was a prerequisite for WTAS getting Nutrien business from Wes Bradley." (Williams Memo. p. 12, ECF No. 253-1.) On the other hand, Defendants/Third-Party Plaintiffs point to portions of Williams' deposition testimony from which a jury could find that she knew about the "kickback" scheme.[6] For example, in response to the question "And you also made the assumption that if WTAS was going to get the referrals from Nutrien, that they have to pay Kell[i] Bradley 50 cents an acre?" Williams answered "Yes. I mean, I assumed again, if it's how – that's how it worked." (Resp. to Williams St. Mat. Fcts. No. 65, ECF No. 263-1 (citing Williams Depo. I, 45:20-24)).

There are also disputed issues of fact as to the meaning of the language in Exhibit E to the APA. This language states that Warne will "work with managers of Nutrien Ag Solutions to maintain vendor (sic) contract with WTAS to provide exclusive service as 'on call' provider for

---

[6] There are also disputed issues of fact as to whether the payments to Kelli Bradley actually were in the nature of a kickback. The jury will decide this issue at trial.

work as needed." (Resp. to Williams St. Mat. Fcts. No. 47, ECF No. 263-1.) Defendants/Third-Party Plaintiffs argue that Warne and Williams were affirmatively stating in this provision that West Tennessee Air had an exclusive service agreement with Nutrien that Warne would continue to maintain, while knowing that there was no such agreement. Williams denies that this language indicates that there was such an agreement. A jury will have to decide this issue.

Williams also raises the issue of causation as to all claims. She claims that Wes Bradley stopped referring business to the Riches because they refused to do a job for him, which resulted in financial losses to Defendants/Third-Party Plaintiffs. In response, Defendants/Third-Party Plaintiffs clarify that their claims are based on their allegations that they would not have contractually obligated themselves to pay $1.8 million dollars under the APA but for Williams, Warne, and West Tennessee Air concealing critical and material information from them. They state that their "damages were proximately caused by their being grossly misled and fraudulently induced into contractually obligating themselves on March 31, 2021 by signing the APA — a transaction dreamed up by Warne, agreed to by Bradley, and drafted by Williams." (Defs/Third-Party Pls' Resp. p. 8, ECF No. 263.)

Causation is an element of fraud,[7] negligence, breach of fiduciary duty, and legal malpractice. *See Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (stating that causation is an "essential element" of a fiduciary duty claim); *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (stating that a plaintiff's injury must be a result of the misrepresentation); *Gibson v. Trant*, 58 S.W.3d 103, 108 (Tenn. 2001) (stating that an attorney's negligence must be actual and proximate cause of the plaintiff's damages); *Kilpatrick v. Bryant*,

---

[7] "Intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action and involve the same elements under Tennessee law. *See Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012) (citations omitted).

868 S.W.2d 594, 598 (Tenn. 1993) ("Causation [in fact] and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence.").

Here, Defendants/Third-Party Plaintiffs have pointed to sufficient evidence from which a jury could find that (1) they would not have entered into the purchase transaction if they had known certain alleged facts, including that West Tennessee Air did not have an exclusive service agreement with Nutrien and that there existed a kickback scheme and (2) the withholding of this information was the proximate cause of their injuries. *See Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994) ("Proximate cause, as well as superseding intervening cause, are ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." (citations omitted)).

Next, Williams contends that Defendants/Third-Party Plaintiffs cannot show that she defrauded them. A plaintiff must establish the following essential elements to succeed on a fraud claim:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Walker*, 249 S.W.3d 301, 311 (Tenn. 2008). Williams asserts that she did not make any false statement of past or existing fact to Defendants/Third-Party Plaintiffs and that, even if she did, they cannot show that they reasonably relied on her misrepresentation.

> Whether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors. The factors include the plaintiff's sophistication and expertise in the subject matter of the representation, the type of relationship — fiduciary or otherwise — between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation.

*Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010) (citations omitted). Here, based on these factors, reasonable minds can differ as to whether Williams made misrepresentations, whether the Riches relied on the alleged misrepresentations, and whether their reliance was unreasonable.

Williams asserts that the APA language is merely prospective, that only Warne – and not Williams - made statements regarding Nutrien, and that her statements regarding agricultural practices constituted opinion only.  However, the jury could look at the first and subsequent drafts of the Consulting Agreement prepared by Williams which states that Warne will maintain the exclusive service contract between Nutrien and West Tennessee Air, which she defined as "WTAS," and conclude that Williams mispresented whether Nutrien and West Tennessee Air had an exclusive contract. The jury could determine that this language is not a statement about a possible future event, but rather a representation that an existing vendor contract was in place and would be maintained. That is, the jury could find that, if there were no existing contract, there would be nothing to maintain, thus making the representation inherently about a present or existing fact.

Additionally, Williams drafted a provision requiring the Riches to pay Kelli Bradley $0.50 per acre "for accounting, record keeping and collection services." Williams discussed this arrangement with the Riches. The jury could find that the drafting and communication of these terms constituted representations of existing business arrangements, not mere opinion or future intent. If the jury finds that this arrangement was a kickback scheme, it could also find that Williams knew that she drafted a provision obligating WTAS to pay a kickback to Wes Bradley but did not reveal that to Defendants/Third-Party Plaintiffs.

As for reasonable reliance on the alleged misrepresentation(s), there is evidence in the record from which the jury could find that Williams drafted the transaction documents, possessed

the relevant legal expertise, withheld her knowledge regarding the absence of a Nutrien contract and the true nature of the Kelli Bradley payments, and that the Riches relied on her guidance in light of her position as their attorney and the absence of evidence to show whether she disclosed any conflicts in her position to the Riches.

Fraudulent concealment occurs when a party with a duty to disclose material facts fails to do so, resulting in injury to another who reasonably relies on the omission. *See Chrisman v. Hill Home Dev., Inc.*, 978 S.W.3d 535, 538-539 (Tenn. 1998). *See also Cherry v. Williams*, 36 S.W.3d 78, 85 (Tenn. Ct. App. 2000) ("Generally speaking, fraudulent concealment exists when a party having a duty to disclose some fact or facts intentionally hides the facts with the intent to mislead the other party." (citation omitted)). "To establish fraudulent concealment, a plaintiff must prove (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence." *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998) (citations omitted). "[W]hen there is a confidential or fiduciary relationship between the parties, the "failure to speak where there is a duty to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape investigation." *Id.* (quoting *Hall v. De Saussure*, 41 Tenn. App. 572, 297 S.W.2d 81, 85 (1956)).

In this case, the Court has found that Williams had a "confidential or fiduciary relationship" with the Riches when she became their attorney and prepared documents on their behalf necessary for completion of the purchase transaction. As noted by Defendants/Third-Party Plaintiffs, Williams' argument that she had no obligation to disclose the alleged kickback scheme because it was merely her opinion that it was offensive is misplaced. Defendants/Third-Party Plaintiffs are claiming that she fraudulently concealed the facts underlying her opinion. The jury could find that

22

her failure to disclose these material facts, despite her knowledge and her role as the Riches'
attorney, constituted a breach of her duty and resulted in the harm alleged.

Williams contends that Defendants/Third-Party Plaintiffs knew as much about the payment
to Kelli Bradley as she did. Williams acknowledges that the "failure to speak where there is a duty
to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape
investigation."

Although it appears that everyone was aware of the payments to Mrs. Bradley for
bookkeeping services, there is a disputed issue of fact as to whether those payments were in the
nature of a kickback. That is, her husband, Wes Bradley, would only facilitate the working
agreement between Nutrien and Defendants/Third-Party Plaintiffs if Mrs. Bradley was paid for her
services. Defendants/Third-Party Plaintiffs have pointed to portions of Williams' deposition from
which the jury could find that Williams knew that Wes Bradley's facilitation was contingent upon
payment to Mrs. Bradley.  A duty to disclose "may render silence or failure to disclose known
facts fraudulent." *Shadrick*, 963 S.W.2d at 735 (citation omitted).

"To succeed on a negligent misrepresentation claim, a plaintiff must establish that: (1) the
defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did
not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs
justifiably relied on the information." *Stanfill v. Mountain*, 301 S.W.3d 179, 189 (Tenn. 2009)
(quoting Walker, 249 S.W.3d at 311.) The Court agrees with Defendants/Third-Party Plaintiffs
that the same facts that support their claim for intentional misrepresentation support a claim for
negligent misrepresentation against Williams.  As already discussed, there are facts in the record
from which a jury could find that Williams knew that there was no contract between Warne and

Nutrien and that she knew that Wes Bradley's business with Warne was secured by a kickback to Kelli Bradley to be continued by WTAS and yet she failed to advise the Riches of such.

Williams also argues that the negligent misrepresentation claim could be "subsumed into claims for breach of fiduciary duty or legal malpractice." (Williams Memo. p. 27, ECF No. 253.) This argument is better presented after the jury has heard all the proof. Williams can make any appropriate motions on this claim at that juncture.

Tennessee recognizes a common law claim for aiding and abetting. *Carr v. United Parcel Service*, 955 S.W.2d 832, 836 (Tenn. 1997) (overruled on other grounds by *Parker v. Warren County Utility Dist.*, 2 S.W.3d 170 (Tenn. 1999)).[8] If the underlying tort of the aiding and abetting claim is fraud, the allegations of the complaint must satisfy the particularity requirements of Rule 9.02 of the Tennessee Rules of Civil Procedure. *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 547-48, 554. Williams contends that Defendants/Third-Party Plaintiffs have not pled fraud with particularity. The Court disagrees.

Defendants/Third-Party Plaintiffs have sufficiently pled that, while Williams was acting as their attorney, she knew that Warne and West Tennessee Air intended to – and did – defraud them. They have presented facts from which a jury could find that Williams provided affirmative and substantial assistance to Warne and West Tennessee Air that enabled the scheme to succeed. *See Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519**,** 537 (6th Cir. 2000) (stating that a plaintiff must show that the defendant's encouragement or assistance was a "substantial factor" in causing the tort).

---

[8] Tennessee law does not recognize a claim for aiding and abetting breach of contract. *Fuller v. Cmty. Nat'l Bank*, 2020 WL 1485696, at *12 (Tenn. Ct. App. Mar. 27, 2020).

There are facts in the record from which the jury could find that Williams possessed actual knowledge of Warne's false representations to the Riches. Williams drafted the APA and related transaction documents that allegedly embedded Warne's material misrepresentations. As argued by Defendants/Third-Party Plaintiffs, the jury could find that the actions of Williams amounted to cloaking the alleged falsehoods in the mantle of legal authenticity, and, thus, the jury could find that her conduct satisfies the "substantial assistance" requirement for aiding and abetting liability.

Additionally, Williams represented the Riches in establishing WTAS, LLC, the entity that purchased West Tennessee Air's assets. The jury could find that this gave Warne the corporate vehicle he needed to consummate the fraud. The jury could further find that, by lending her professional expertise and credibility to these efforts, Williams materially advanced Warne's scheme and directly contributed to the Riches' reliance on the misstatements. These specific and particularized facts create an issue of material fact as to Williams' liability for aiding and abetting Warne's fraud.

Next, Williams contends that Defendants/Third-Party Plaintiffs are not entitled to punitive damages as a matter of law. *Hodges v. S. C. Toof and Co.*, 833 S.W.2d 896, 901 (Tenn. 1992), established that a court may award punitive damages in Tennessee only if it finds by clear and convincing evidence that a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. Clear and convincing evidence leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 901 n. 3. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).##

Punitive damages in Tennessee are now governed by statute. See T.C.A. § 29-39-104. This statute essentially codifies the common law in terms of the type of conduct that will support a punitive damages award and the required burden of proof. T.C.A. § 29-39-104(a)(1).).

Williams bases her argument on factors that the Court has either already rejected or has found as a disputed issue of fact whether Williams acted intentionally, fraudulently, maliciously, or recklessly. She has not convinced the Court that a jury could not find these facts by clear and convincing evidence. The jury could find that her representation of both the seller and the buyer in a complex commercial transaction created a conflict that was not waivable. If the jury finds that there was a kickback scheme and that Williams knew of it but did not alert the Riches prior to the completion of the purchase transaction, the jury could also find that Williams acted maliciously and/or recklessly. This holds true for the alleged concealment of the absence of a contract with Nutrien. The jury could also look at evidence that, weeks after the APA closing, Williams became trustee of the Warne Family Trust without informing the Riches and continued to represent the Riches in a related transaction that used Trust assets as security.

The Court agrees with Defendants/Third-Party Plaintiffs that, taken together, these facts, if proved at trial, create a genuine issue as to whether Williams acted intentionally, fraudulently, maliciously, or recklessly and would allow a jury to find that the elements needed to award punitive damages were proved clearly and convincingly.

Williams next argues that Defendant/Third Party Plaintiff's claims are barred by comparative fault, waiver, estoppel, ratification, and acquiescence. She contends that the Riches knowingly and willingly closed the purchase transaction by assenting to the terms by virtue of their execution of the closing documents. She asserts that no documents identified any contract or agreement with any customer held by West Tennessee Air. According to Williams, the Riches

26

knew the consequences of going forward with the purchase and had ample opportunity to avoid the consequences of the transaction if they wanted. Williams concedes that comparative fault is# typically a question for the trier of fact." *Norris v. Pruitte*, 1998 WL 1988563, at \*3 (Tenn. Ct. App. Aug. 24, 1998).

As the Court has stated repeatedly in this order, Defendants/Third-Party Plaintiffs have pointed to evidence in the record showing a dispute as to whether the knowledge of the Riches was coexistent with the knowledge of Williams at the time of the purchase. This precludes summary judgment on Williams' affirmative defenses. The Riches could not ratify, affirm, or acquiesce in any actions if they were not made aware of all the facts. #

Defendants/Third Party Defendants have brought a breach of fiduciary duty claim against Williams concerning the Marty Moody Transaction (Claim VIII). They allege that Williams, as counsel for Warne and Plaintiff, prepared and filed a UCC lien on the assets of WTAS in connection with the Asset Purchase Agreement that applied to "all assets" of WTAS including "any additions or replacements." Williams subsequently represented the Riches and WTAS as counsel in the acquisition of assets sold to them by Moody. Further, Williams failed to advise the Riches and WTAS that assets purchased from Moody would be subject to the UCC lien she prepared and filed on behalf of Warne and Plaintiff and that Warne and Plaintiff could challenge the sale of assets subject to the UCC lien. She also allegedly failed to advise the Riches and WTAS that UCC liens are negotiable with the lienholder and, therefore, the Riches and WTAS lost any opportunity to renegotiate the lien with Plaintiff and Warne prior to this lawsuit. And she failed to advise the Riches and WTAS that they could have purchased the tangible assets in the Moody Transaction through Rich Family Enterprises, thus avoiding the UCC lien. According to Defendants/Third Party Plaintiffs, although it was in their best interest to know of the extent of the

UCC lien, their lack of knowledge benefited Williams, Warne, and Plaintiff. In essence, they allege that Williams should have told them that Warne's entity – West Tennessee Air – would have a lien for after-acquired property.

In her motion, Williams appears to acknowledge that she did, indeed, represent the Riches in this transaction, but she argues that any claims that the Riches make about this later transaction should be dismissed because the UCC lien for later-acquired assets has been released. She has presented unrefuted evidence that there is no UCC lien outstanding against the Riches for the Moody Transaction. (Wallis Dec., ECF No 253-1.) Also, while there was, at one time, a lien against WTAS for the after-acquired assets, all these assets were deleted from the UCC lien on March 21, 2024. *Id.* Thus, there is no lien outstanding which means that the Riches cannot show they were damaged by any action or inaction of Williams. Defendants/Third-Party Plaintiffs have failed to refute William's evidence in support of her argument that they cannot show that they suffered any damage from her representations of them in the Moody Transaction. Accordingly, the Court will grant this portion of Williams' motion. However, the Court will not necessarily preclude Defendants/Third-Party Plaintiffs' introducing evidence at trial of her representation of them in this later transaction if the evidence is relevant to establish any elements of their other claims.

Finally, the Court finds that there are disputed issues of fact as to Williams' statute of limitations defense. The parties agree that all claims against Williams, except the fraud claim, are governed by Tennessee's one year statute of limitations. *See* Tenn. Code Ann. § 28-3-104. Williams contends that the undisputed facts establish that Williams and the Riches had co-extensive knowledge of the facts related to the bookkeeping work done by Kelli Bradley. She asserts that there are no facts to support a finding that she knew there was a purported "kickback" scheme and, even if she did, the Riches had constructive or actual knowledge of that same

information sufficient to commence the running of the statutory limitations period. However, they did not file suit until more than a year later, on April 24, 2024. Contrarily, Defendants/Third-Party Plaintiffs assert that they did not discover Williams' alleged malpractice or malfeasance until the time of her deposition on February 6, 2024.

It is well-established that Tennessee law provides that the accrual of a cause of action is determined by applying the discovery rule. *Shadrick*, 963 S.W.2d at 733. "In legal malpractice cases, the discovery rule is composed of two distinct elements: (1) the plaintiff must suffer legally cognizable damage — an actual injury — as a result of the defendant's wrongful or negligent conduct, and (2) the plaintiff must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's wrongful or negligent conduct." *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998). "[A]n actual injury occurs when there is the loss of a legal right, remedy or interest, or the imposition of a liability. An actual injury may also take the form of the plaintiff being forced to take some action or otherwise suffer 'some actual inconvenience,' such as incurring an expense, as a result of the defendant's negligent or wrongful act." *Id.*

> The knowledge component of the discovery rule may be established by evidence of actual or constructive knowledge of the injury. Accordingly, the statute of limitations begins to run when the plaintiff has actual knowledge of the injury as where, for example, the defendant admits to having committed malpractice or the plaintiff is informed by another attorney of the malpractice. Under the theory of constructive knowledge, however, the statute may begin to run at an earlier date — whenever the plaintiff becomes aware or reasonably should have become aware of facts sufficient to put a reasonable person on notice that an injury has been sustained as a result of the defendant's negligent or wrongful conduct.

*Kohl*, 977 S.W.2d at 532-533 (citing *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995)).

"For the purposes of both the discovery rule and the doctrine of fraudulent concealment, whether a plaintiff exercised reasonable care and diligence in discovering her injury is usually a fact

question for the trier of fact to determine." *Coffey v. Coffey*, 578 S.W.3d 10, 22 (Tenn. Ct. App. 2018) (citing *Wyatt v. ABest, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995)). "Without question, an attorney's purposeful concealment from a client of facts that prevents the client from learning of an injury can toll the statute of limitations on legal malpractice." *Cherry v. Williams*, 36 S.W.3d 78, 85 (Tenn. Ct. App. 2000).

According to Williams, the Riches' claims are time-barred because they had coextensive knowledge of any undisclosed facts which means that the Riches' cause of action against her accrued when they learned that Warne had defrauded them. At the latest, that would be the time the Riches filed their Iowa lawsuit in January 2023. In support of her argument, she points to the following undisputed facts.

1. Both the Riches and Williams knew, prior to the execution of the APA, that Kelli Bradley did the bookkeeping/invoicing work for West Tenn. Air and was paid $0.50 per acre for this work.

2. The Riches needed a bookkeeper for WTAS and the Riches believed paying a bookkeeper, such as Kelli Bradley, $0.50 per acre was proper.

3. Both the Riches and Williams knew that West Tennessee Air's Nutrien customers "went through" Wes Bradley.

4. Both the Riches and Williams knew that Nutrien guaranteed payment to the crop duster, regardless of whether the grower paid Nutrien.

5. Both the Riches and Williams knew that Wes Bradley was married to Kelli Bradley.

6. The Riches filed suit in Iowa only against Warne.

Defendants/Third-Party Plaintiffs correctly point out that the issue is not when the Riches learned about the alleged fraud, but rather when the Riches learned that Williams knew about the fraud and failed to disclose her knowledge to them. The Court agrees that nothing in the facts set forth show that the Riches were aware or should have been aware that Williams possessed any knowledge of the alleged fraudulent scheme.

In particular, Defendants/Third-Party Plaintiffs point to Williams' testimony that she knew "from the beginning" that there was no written contract between West Tennessee Air and Nutrien. A jury could find that Defendants/Third-Party Plaintiffs did not learn of Williams' knowledge regarding the absence of a Nutrien contract until her deposition. There are also disputed issues of fact as to whether Williams believed that the Kelli Bradley bookkeeping arrangement was a disguised kickback scheme involving Wes Bradley at Nutrien and concealed this information from Defendants/Third-Party Plaintiffs or that Defendants/Third-Party Plaintiffs should have known about this alleged scheme. Thus, the Court denies Williams' motion for summary judgment on the ground that Defendants/Third-Party Plaintiffs' claims (other than fraud) are barred by the one-year statute of limitations because there are disputed issues of fact on this issue which must be decided by a jury.

In summary, the motion of Defendants/Third Party Plaintiffs is **GRANTED** on the issue of whether Williams (and Ashley & Arnold vicariously) was their attorney during the transaction and whether she owed them a fiduciary duty. At trial, the jury will be instructed that the Court has found these issues as a matter of law. The remaining portion of their motion is **DENIED**. Williams' motion is **GRANTED** as to Defendants/Third-Party Plaintiffs' breach of fiduciary duty concerning the Moody Transaction (Claim VIII); Williams' motion is **DENIED** on the remaining claims.

      **IT IS SO ORDERED.**

                                        **s/ S. Thomas Anderson**
                                        S. THOMAS ANDERSON
                                        UNITED STATES DISTRICT JUDGE

                                        Date: January 7, 2026.