## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

**WEST TENNESSEE AIR SERVICE, LLC,**

        **Plaintiff/Counter-Defendant,**

**vs.**                                                    No. 1:23-cv-1132-STA-jay

**WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,**

        **Defendants/Counter-Plaintiffs.**


**WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,**

        **Third-Party Plaintiffs,**

**vs.**

**MONTE WARNE; MARIANNA WILLIAMS,
individually; and ASHLEY & ARNOLD,
a partnership,**

        **Third-Party Defendants.**

---

## ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

---

West Tennessee Air Service, LLC ("West Tennessee Air") filed this action in state court asserting a claim for breach of contract against WTAS, LLC and Kyle and Melody Rich related to the purchase of West Tennessee Air's crop-dusting business assets by Defendants. Defendants removed the action to this Court. Subsequently Defendants filed a third-party complaint against Monte Warne, the former owner of West Tennessee Air.  On April 19, 2024, the Court allowed Defendants to bring additional claims against Marianna (Molly) Williams, individually; Marianna

Williams, as Trustee of the Meredith Z. Warne Family Trust;[1] and Ashley & Arnold, Williams'

employer; and to assert new claims against Monte Warne. (Amd. 3rd Party Cmplt., ECF No. 155.)

Defendants/Third-Party Plaintiffs ("Defendants") have now filed a motion for partial

summary judgment seeking judgment as a matter of law against West Tennessee Air and Monte

Warne on Defendants' claims of fraud and misrepresentation (Count I), negligent

misrepresentation and concealment (Count II), breach of contract (Count III), and violation of the

Tennessee Consumer Protection Act ("TCPA") (Count V). They also move the Court to dismiss

West Tennessee Air's claim for breach of the Asset Purchasing Agreement ("APA"). (ECF Nos.

254, 255.) West Tennessee Air and Warne have filed a cross-motion for partial summary judgment

against Defendants. (ECF No. 258.) They seek judgment as a matter of law on Defendants' claims

of fraud and misrepresentation (Count I), negligent misrepresentation and concealment (Count II),

tortious interference (Count IV), and violation of the TCPA (Count V). The motions have been

fully briefed and are ready for a decision.[2] For the reasons set forth below, the motions for

summary judgment are **DENIED**.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the

evidence in the light most favorable to the non-moving party and must draw all reasonable

inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

---

[1]  The claims against the Trustee have been dismissed. (Ord., ECF No. 226.)
[2]  The parties agree that the law of the state of Tennessee applies to the claims brought in this
matter.

U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Statement of Undisputed Material Facts</u>

Pursuant to the Local Rules of this Court, the parties have prepared statements of material facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Each party has responded to the movant's statement and has submitted statements of additional facts. These additional facts have been responded to.

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

3

non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). The non-moving party must respond to the movant's statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, the non-movant may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If the non-movant asserts that a genuine dispute of material fact exists, it must support its contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court has disregarded any inadmissible evidence in making its decision. The parties may renew any pertinent objections at trial. The Court finds that there is no genuine dispute as to

the following facts unless otherwise noted. [3]

This case arises from a transaction in which WTAS, which was owned by Kyle and Melody Rich, purchased certain assets from West Tennessee Air, a crop-dusting company. Monte Warne was the president of, pilot for, and 1 % owner of West Tennessee Air. The remaining 99% was owned by the Meredith Z. Warne Family Trust.

Warne got his pilot's license in 1974 and began crop dusting in 1976. He quit in 1990 to pursue building motorcycles at Boss Hoss. Warne did not work in the crop-dusting industry again until 2014, when he began to fly for West Tennessee Ag Service, LLC ("West Tennessee Ag"). West Tennessee Ag was owned by three local farmers - Jimmy Hargett, Hedric Shoaf, and Holt Shoaf.

Warne became the pilot for West Tennessee Ag in 2014 and flew exclusively for West Tennessee Ag as a "contract pilot" until December 2, 2019.

West Tennessee Air began operations in December 2019, when Warne, acting on behalf of West Tennessee Air and the Family Trust, purchased all the assets of West Tennessee Ag for $555,000; the assets included an airplane, an auger truck, and a semi-truck. The purchase price did not include a specific allocation for goodwill. That is, even though some goodwill may have been transferred at the time of the sale between West Tennessee Ag Service and West Tennessee Air, there was not a specific line item in the closing paperwork.

---

[3] The parties also state that some facts are disputed only for the purpose of the Court's deciding the motion for summary judgment. At other times, a party has noted that a particular statement does not contain material facts that must be decided in order to resolve any substantive claim or defense but concedes that the statement is undisputed for purposes of ruling on the parties' competing motions for summary judgment. All facts are stated for the purpose of deciding these motions only.

On or about December 16, 2020, Warne published an online advertisement to sell West Tennessee Air on "Barnstormers.com." He described it as a "turnkey business" with "all customers and collections guaranteed from 3rd party."

Beginning in January 2021, the Riches, Warne, and West Tennessee Air, by and through Warne, engaged in discussions regarding all aspects of West Tennessee Air and began to negotiate an agreement for the Riches (and eventually WTAS) to purchase, among other things, the trade name "West Tennessee Air Service," goodwill, going concern, equipment, customer files, customer information, billing information, pricing information, advertising and promotion material. The agreement was to include a three-year consulting and non-compete agreement with Warne.

The purchase transaction was initially to be effectuated by a Membership Interest Purchase Agreement ("MIPA"). Before the scheduled closing date, the Riches decided to use an Asset Purchase Agreement ("APA") vehicle for purchasing West Tennessee Air's assets rather than a MIPA. The switch to the APA from the MIPA required the Riches to create WTAS, a new LLC, to serve as the acquiring entity.

The original and all subsequent versions of the transaction documents contained a Consulting, Non-Competition, and Non-Solicitation Agreement ("Consulting Agreement") that would become Exhibit E to the transaction documents ultimately executed.  The Consulting Agreement provided that Monte Warne would "[w]ork with managers of Nutrien Ag Solutions to maintain vendor contract with WTAS to provide exclusive service as 'on call' provider for work as needed."

The Riches were the sole members of the newly created Tennessee limited liability company named WTAS, LLC. WTAS was the buyer in the transaction.

Kyle Rich has been involved in the aerial application (a/k/a crop-dusting) business and farming all his adult life. The Riches have owned and operated a crop-dusting business in Iowa for more than thirty-five years. Kyle Rich started agricultural flying in 1990 and has operated primarily in Iowa since 1991.

The Riches have an adult son, Kaleb Rich, who was learning how to fly crop-dusting airplanes during the relevant events and who was to be part of the WTAS operation in Tennessee. Kaleb attended Epic Flight Academy in Florida. Kaleb had hundreds of hours of flight time when he began working for WTAS. Wes Bradley and Warne were aware of Kaleb's experience and qualifications and approved of his abilities as a pilot. In February of 2021, before they executed the APA, the Riches made a trip from Iowa to Dyersburg. The purpose of the trip was to introduce Kaleb to Wes Bradley.

As part of their due diligence, the Riches inspected the equipment purchased, spoke to Monte Warne and to Wes Bradley, and used the financial statements and performance of West Tennessee Ag and West Tennessee Air to evaluate the customer base.

However, before they executed the APA, the Riches did not ask to see Warne's customer lists; Warne agreed to supply the lists post-closing. They did ask to see West Tennessee Air's financial statements and the financial statements of West Tennessee Ag to support their understanding that West Tennessee Air and Warne had a substantial customer base.

The Riches understood that Warne did not have written contracts with customers; instead, they understood that West Tennessee Air and Warne had performed services for its customers through oral contracts and that Warne had been running West Tennessee Ag and West Tennessee Air for their entire existence. They believed that Warne had an exclusive service contract with an agricultural company named Nutrien Ag Solutions.

7

Warne represented to the Riches that, because "everybody knew him and [he] had been in the ag business a long time," he knew his non-Nutrien customers, and they were a substantial portion of his business. The parties disagree as to how much the non-Nutrien customers were part of that business. Melody Rich testified that 60% of WTAS's revenues in the first year of operation came through Nutrien and Wes Bradley.

Wes Bradley, at all times material, worked for Nutrien. The Riches knew, before executing the APA, that Bradley was a manager for Nutrien. Bradley, at all times material, was married to Kelli Bradley. The Riches knew, before executing the APA, that Bradley was married to Kelli Bradley.

Warne's booking, customer data, field location, and chemical payload were all given to him by Wes Bradley every day that he flew.

West Tennessee Air's business included work arising from an on-call arrangement with Wes Bradley as manager of Nutrien locations; when Bradley called with spraying jobs, Warne went.

The spraying jobs were time sensitive. Warne testified, "They are time-sensitive crops, and it was very important to have the chemicals applied on time in that time period. If you don't, it wastes the chemicals, no sense in doing it." Warne responded quickly and consistently to Bradley's spraying requests.

Warne asserted that he was "the goodwill" with regard to West Tennessee Air and its sale price of $900,000 for goodwill. He admitted that "Wes Bradley would have been a big part of the goodwill" because he "furnished all the customers." Warne does not dispute that he made these statements, but he does dispute the inference to be drawn from the statements.

8

The transaction closed on March 31, 2021. The Riches paid $1.8 million to Warne and the Trust, allocated 50-50 between the hard assets and West Tennessee Air's customers and business reputation, i.e., its goodwill. One-half of the purchase price was made by way of a promissory note, which remains unpaid.

In 2021, Kyle Rich and Melody Rich informed their bank in Iowa that they expected to earn $700,000 in gross revenue in WTAS, LLC Tennessee operations.  WTAS earned gross revenue of $913,000 in 2021.

Wes Bradley referred all Nutrien business to WTAS in 2021, but not in 2022 or 2023.

The Riches knew, before executing the APA, that Kelli Bradley did the bookkeeping/invoicing for West Tennessee Air and was paid $0.50 per acre by West Tennessee Air for her services.[4] The Riches needed someone to do the billing and collections for WTAS, and they found nothing improper or unreasonable about paying $0.50 per acre for those services as long as the person performing the services was doing a good job.

After the execution of the APA, the Riches paid Kelli Bradley $0.50 per acre to do their billing and collections. In September 2021, the Riches discovered that the billing was going "very, very slow" and that Kelli Bradley had failed to bill approximately $80,000 in invoices to customers and was not properly keeping work orders. They then changed their agreement with Kelli Bradley and paid her to do billing and collections for Nutrien customers only. Melody Rich began to do the billing and collections for the non-Nutrien accounts. Warne responded, "Wes is not going to like not getting his cut."

---

[4] The parties dispute whether Kelli Bradley received this money strictly for bookkeeping services or whether the payment was in the nature of a "kickback."

Approximately 50% of West Tennessee Air's customers were also Nutrien customers. Nutrien customers went through Wes Bradley, and Nutrien guaranteed payment to the crop-duster regardless of whether the grower paid.

In 2022, Kelli Bradley did some invoicing for WTAS, as well as for Nat Crenshaw/Ariel Solutions. By the end of 2022 and for the entirety of 2023, Kelli Bradley did not provide invoicing services for any aerial applicator.

By spring and early summer 2022, the Riches began to see their business from Wes Bradley dry up considerably. The parties dispute the cause of the "drying up." In May 2022, the Riches were becoming worried as they had "not done much flying up to this point," as they told Warne in an email. They also mentioned that they did not want to be known as the "Nutrien plane."

By the end of May 2022, Warne admitted to the Riches, "Wes was the go-to for the majority of the work and I didn't even know the farmers … when Kaleb took over. Wes handled it all and lined up all the work. Please keep a good working relationship with him and he will get you the work." Warne does not dispute that he made this statement but clarifies that the Riches met Bradley during the purchase process and understood the nature of the business relationship between West Tennessee Air and Nutrien/Bradley. That is, WTAS must be available when needed in order to have work directed to it.

The Riches asked Warne to introduce them to some of the growers they had been flying for and to meet other potential growers and cooperative managers. Warne responded, "I'll do whatever you need."

Wes Bradley, for Nutrien, used Aerial Solutions to provide crop-dusting service for its customers from September 2022 through March 2023. At that point, Bradley began using Monte

Warne exclusively until the end of October 2023. In November 2023, Bradley apparently engaged Aerial Solutions again.

Warne began flying and working for H&H in April 2023, at which time Wes Bradley began giving all Nutrien's work to H&H. During the 2023 season, Nutrien paid H&H $337,824.

Warne collected 20% of what Nutrien paid to H&H. Warne does not dispute this statement but contends that this activity did not occur until after WTAS and the Riches allegedly breached the installment promissory note and thereby voided the non-compete agreement. Warne asked for his $60,000 payment to be delayed until February 7, 2024.

Warne admits that he directly competed against the Riches by taking Nutrien's work and soliciting other customers of the Riches, including Sterling Edwards. However, he again maintains that this activity did not occur until after WTAS and the Riches allegedly breached the installment promissory note and voided the non-compete agreement. Warne thanked Bradley in 2023, saying, "Been a good year for me. Thx!!"

Warne did not perform work for any entity other than WTAS as an agricultural pilot until after WTAS failed to make payments under the installment promissory note.

WTAS, Kyle Rich, and Melody Rich failed to make the November 2022 payment to West Tennessee Air under the installment promissory note.[5]

The Riches experienced a substantial decrease in their revenue in 2022 and had nearly none in 2023 from Nutrien or Wes Bradley's contacts.

Warne offered to perform flying services to WTAS for free in 2022 when WTAS's business from Wes Bradley was sharply declining, in response to Kyle and Melody Rich requesting

---

[5] The Riches contend that they were not obligated to make the November 2022 payment to West Tennessee Air because of Warne and West Tennessee Air's alleged fraud and gross misrepresentations and Warne's breach and neglect of contractual obligations.

that Warne help them and WTAS with the transition, "meeting with people and letting them know about West Tennessee Air Service and the services we offer."

In 2020, another crop-dusting outfit began working from the same air strip that WTAS started using when it became operational in 2021. WTAS denies knowing that it knew at the time of executing the APA that another crop-dusting operator was using the air strip.

With the exception of one request on August 10, 2022, WTAS did all of the work requested by Wes Bradley through July 2022. The Riches declined that job because they already had another job scheduled for the day and they believed that the requested job from Wes Bradley was not safe. Additionally, the job was eighty miles from WTAS's location in Dyersburg, Tennessee. Kyle Rich, who was in Iowa at the time, checked WTAS's availability and responded that they were unable to accept the job because of a prior commitment and the location of the work. Bradley responded, "I'll find someone else. No problem."

Although Bradley testified that he stopped using WTAS because the Riches turned down a job in August 2022, he also testified that the Riches did "good work" and he did not have any problem with the quality of their performance nor was he unsatisfied which their performance. WTAS and the Riches are unaware of any significant complaints from Wes Bradley as to the timeliness of service.

The Riches are not aware of anybody in the agricultural business that has a written contract that obligates them to use a particular crop-dusting company. The Riches have never had a written contract with any customer that obligates the customer to use the Riches' crop-dusting company.

Before the Riches signed the APA, they knew that any prior customers of West Tennessee Air had the right to choose which aerial spray company to use for their crop-dusting needs. Kyle Rich agreed that "[a] customer can use you or if they choose to send you down the road . . . ."

<u>Analysis</u>

West Tennessee Air and Monte Warne frame this lawsuit as an "unfortunate story" in which the Riches "purchased a successful business, decided they did not like the business model after they purchased it, would not service customers in the same way the prior owner had done, and so they failed; now they seek to put the blame on anyone but themselves." (Warne Mot. p. 1, ECF No. 258-1.) On the other hand, the Riches contend that they "wanted the business that they had been *sold*, but what they had been sold was a lie." (Riches Resp. p. 2, ECF No. 262 (emphasis in original)). They state that they "executed the APA because West Tenn. Air and Warne, knowingly misrepresented the company's history, assets, and prospects with the intent to induce [them] to execute the APA." (Riches Mot. p. 2, ECF No. 254-1.) They claim that, when they quit paying a "kickback" to Wes Bradley through payments to his wife Kelli, "Bradley and Warne cut off the Riches" and took their business elsewhere.  (Riches Resp. p. 2, ECF No. 262.)

<u>Count One - Fraudulent Inducement/Fraud/Intentional Misrepresentation/Fraudulent Concealment</u>

In their third-party complaint, Defendants have brought claims of fraudulent inducement, fraud, intentional misrepresentation, and fraudulent concealment against West Tennessee Air and Warne. "Intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action and involve the same elements under Tennessee law. *See Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012) (citations omitted). The Tennessee Supreme Court has even suggested that the term "intentional misrepresentation" replace "fraud" and "fraudulent misrepresentation" as the best label for these causes of action and be used exclusively in Tennessee so as to avoid confusion. *Id.* at 342 & n.28.

To recover for intentional misrepresentation, a plaintiff must prove that: (1) the defendant made a representation of a present or past fact; (2) the representation was false when it was made;

(3) the representation involved a material fact; (4) the defendant either knew that the representation was false or did not believe it to be true or the defendant made the representation recklessly without knowing whether it was true or false; (5) the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) the plaintiff sustained damages as a result of the representation. (*Id.* at 343 (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). Likewise, the following elements are necessary in order to succeed on a fraud claim:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Walker*, 249 S.W.3d 301, 311 (Tenn. 2008).

Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage. *Brown v. Birman Managed Care, Inc*., 42 S.W.3d 62, 66 (Tenn. 2001) (citations omitted).

Similarly, to establish a claim for fraudulent inducement, a plaintiff must prove: (1) the existence of a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonably right to rely on the statement; and (5) an injury resulting from the reliance. *See Bridgestone America's Inc. v. International Business Machines Corp.*, 172 F. Supp.3d 1007, 1013 (M.D. Tenn. 2016). The difference between fraud and fraudulent inducement is the speaker's intent to induce reliance on the false statement. *Id.*

Reasonable reliance is a required element of claim for common law fraud and for fraudulent inducement. *Holliday v. Patton*, 2014 WL 1281558, at *4 (Tenn. Ct. App. Mar. 31, 2014) (citations omitted).

> Whether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors. The factors include the plaintiff's sophistication and expertise in the subject matter of the representation, the type of relationship — fiduciary or otherwise — between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation.

*Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010) (citations omitted).

"A party commits fraudulent concealment for failing to disclose a known fact or condition where he had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Dixon v. Chrisco*, 2018 WL 4275535, at *4 (Tenn. Ct. App. Sept. 7, 2018) (citations omitted). In order to establish a claim for fraudulent concealment, a plaintiff must show "(1) the defendant had knowledge of a material existing fact or condition, and that (2) the defendant had a duty to disclose the fact or condition." *Id. See also Cherry v. Williams*, 36 S.W.3d 78, 85 (Tenn. Ct. App. 2000) ("Generally speaking, fraudulent concealment exists when a party having a duty to disclose some fact or facts intentionally hides the facts with the intent to mislead the other party." (citation omitted)). Thus, to establish fraudulent concealment, a plaintiff must prove (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence." *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998) (citations omitted).

"Tennessee courts have recognized that fraud by its nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence." *Brown*, 42 S.W.3d at 67 (citations omitted).

West Tennessee Air and Warne have filed a cross-motion for summary judgment on the ground that Defendants cannot show causation, which is an element of fraud and breach of fiduciary duty. *See Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (stating that causation is an "essential element" of a fiduciary duty claim); *Walker*, 249 S.W.3d at 311 (stating that a plaintiff's injury must be a result of the misrepresentation).

Summary judgment must be denied to both parties on Count One because there are disputed issues of fact as to whether West Tennessee Air and Warne made intentional misrepresentations (i.e., fraudulent misrepresentations) as to a material fact, whether the Riches relied on the alleged misrepresentations, whether their reliance was unreasonable, and whether Defendants were damaged as the result of the misrepresentations (causation).

Central to Defendants' claims is Warne's arrangement with Mrs. Bradley.[6] Although it appears that everyone was aware of the payments to Mrs. Bradley for bookkeeping services, there is a disputed issue of fact as to whether those payments were in the nature of a kickback. That is, her husband, Wes Bradley, would only facilitate the working agreement between Nutrien and Defendants if Mrs. Bradley was paid for bookkeeping services. If this is proved at trial and if it is proved that Warner knew that the payments were a kickback, the jury could find for Defendants on their related fraud claims. A duty to disclose "may render silence or failure to disclose known facts fraudulent." *Shadrick*, 963 S.W.2d at 735 (citation omitted).

---

[6] Not only are the allegations about the arrangement with Mrs. Bradley and whether it was a "kickback" scheme central to this claim, it is central to most, if not all, of Defendants' claims. In fact, most of Defendants' claims revolve around the same set of facts.

Defendants have pointed to evidence from which a jury could find that Warne intentionally and/or fraudulently mispresented that West Tennessee Air was a "turnkey" business with customers and goodwill and that those statements were made during the course of business negotiations and for the purpose of inducing Defendants to purchase West Tennessee Air. The jury could find that Warne's business came through Wes Bradley, both the Nutrien and non-Nutrien customers, and was contingent upon payments to Mrs. Bradley. Specifically, the jury could find that Warne fraudulently claimed that the services provided by Kelli Bradley were legitimate and for accounting, record keeping, and collection services when in fact the payment was a kickback to maintain Nutrien business and that he concealed these facts from Defendants. The jury could also find that Warne's statements were made for the purpose of inducing the Riches to buy West Tennessee Air.

However, the jury could find to the contrary that Warne's arrangement with Mrs. Bradley was, in fact, legitimate and not a kickback and that Warne did not mispresent the nature of his business with Bradley and Nutrien in order to induce Defendants to buy West Tennessee Air. Both Warne and Bradley testified in their depositions that there was no such agreement between West Tennessee Air and Nutrien or between WTAS and Nutrien.

There are also disputed issues of facts as to the business itself (West Tennessee Air) that was sold to Defendants. The jury could find that Warne intentionally and/or fraudulently misrepresented that he had an exclusive on-call vendor contract with Nutrien. Defendants have pointed to evidence in the record from which the jury could find that Warne represented to Defendants that a "vendor contract" existed between Nutrien and West Tennessee Air for exclusive service as "on call" provider that would be maintained for the benefit of Defendants.

Additionally, there is a question of fact as to the nature of Warne's relationship with West Tennessee Air's customers and the goodwill that was sold to Defendants. The parties dispute the extent that Warne was willing to help the Riches in meeting his customer base and in maintaining West Tennessee Air's goodwill. Warne indicated in his deposition that he had no real relationship with his customers and, if the customers wanted their crops dusted, they called Bradley. In their own depositions, the Riches testified that they had relied on Warne introducing them to his customer base.

"Tennessee has also recognized that misrepresentation claims may be based on 'promissory fraud,' which requires the plaintiff to show the misrepresentation 'embod[ied] a promise of future action without the present intention to carry out the promise.'" *BiotronX, LLC v. Tech One Biomedical*, LLC, 465 F. Supp.3d 797, 809-810 (M.D. Tenn. 2020) (citations omitted). "In other words, a future promise can support a claim for intentional misrepresentation if it was made with the intent not to perform. On the other hand, '[s]tatements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material past or present fact.'" *Id.* (citations omitted).

Here, Defendants have pointed to sufficient evidence from which a jury could find that (1) they would not have entered into the purchase transaction if they had known certain alleged facts, including that West Tennessee Air did not have an exclusive service agreement with Nutrien and that there existed a kickback scheme and (2) the withholding of this information was the proximate cause of their injuries. *See Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994) ("Proximate cause, as well as superseding intervening cause, are ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." (citations omitted)).

West Tennessee Air and Warne contend that Defendants cannot prove that any of the alleged misrepresentations caused them harm.[7] As noted above, a party bringing a fraud claim must prove that the fraud/misrepresentation caused the asserted harm. According to West Tennessee Air and Warne, Defendants knew that the majority of West Tennessee Air's business came from Bradley and Nutrien and yet they did not want to be known as the "Nutrien plane." They also point to evidence that Defendants refused one of Bradley's spraying jobs. Warne contends that Defendants refused to assist the most important customer of the business, a customer whose business comprised sixty percent of the revenue of the company. There is also evidence that Defendants refused to accommodate two other customers. West Tennessee Air and Warne reason that Defendants' failure to respond to Bradley/Nutrien's needs caused Bradley to sever ties with them rather than the Defendants' decision to modify their agreement with Mrs. Bradley.

In response, Defendant's maintain that they only refused one job for legitimate reasons and that Bradley appeared to be all right with the refusal. They argue that Warne caused their injury by fraudulently inducing them to sign the APA and then induced Bradley to stop using them and engage H&H Flying Service for whom Warne worked after WTAS. They have pointed to evidence from which the jury could find that Defendants paid $1,800,000 for the assets of West Tennessee Air and to assume operations, including $900,000 spent on goodwill for customers that did not exist, and thus Defendants were damaged by the purchase itself. The jury could find that West Tennessee Air's only real customer was Wes Bradley and that his business was contingent on payment to his wife for bookkeeping services. There is also evidence of lost profits sustained by

---

[7] West Tennessee and Warne deny making any misrepresentations but argue that, even if they did, Defendants' own actions were the cause of their alleged injuries.

Defendants from loss of business when Bradley stopped using their services and returned to Warne in 2023.

Accordingly, given the extent and nature of the disputed issues of fact on all elements of Count One, including causation, the Court finds that neither party is entitled to summary judgment on the fraud/intentional misrepresentation claims.

Count Two – Negligent Misrepresentation and Concealment

Defendants have moved for summary judgment in the alternative on their claim of negligent malpresentation and concealment. "To succeed on a negligent misrepresentation claim, a plaintiff must establish that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information." *Stanfill v. Mountain*, 301 S.W.3d 179, 189 (Tenn. 2009) (quoting *Walker*, 249 S.W.3d at 311.) *See also Williams v. Berube & Associates*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000) ("In order to prevail in a suit for negligent misrepresentation, the plaintiffs must establish by a preponderance of the evidence that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiable relied on the information.")

Defendants argue that the same facts that support their claim for intentional misrepresentation support a claim for negligent misrepresentation. They claim that, if Warne's misrepresentations were not intentional, then he failed to exercise reasonable care in either obtaining the information or in communicating the information to Defendants.

As already discussed, there are facts in the record from which a jury could find that Warne intentionally mispresented that there was a contract between Warne/West Tennessee Air and

Nutrien and that Warne knew that Wes Bradley's business with Warne was secured by a kickback to Kelli Bradley. Alternatively, the jury could find that Warne "did not exercise reasonable care in obtaining or communicating the information" to Defendants. The jury could also find that Warne negligently misrepresented and concealed that West Tennessee Air had no goodwill or customer base not connected to Bradley and that the goodwill and customer base connected to Bradley was based on the payment (a/k/a/ kickbacks) to his wife. However, also as previously discussed, the jury could also find that Mrs. Bradley provided a legitimate service first to West Tennessee Air and then to Defendants and that Bradley/Nutrien's business was not contingent upon the payments to her. Accordingly, summary judgment is not proper for either party on Count Two - negligent misrepresentation and concealment.

Count Three – Breach of Contract/Breach of Asset Purchasing Agreement

Next, the parties both move for summary judgment on Count Three. To maintain an action for breach of contract, a plaintiff must establish (1) the existence of an enforceable contract, (2) non-performance of the contract amounting to a breach of that contract, and (3) damages flowing from the defendant's nonperformance. *See Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). A claim for breach of contract must demonstrate losses that are caused by the breach, and no action can be maintained for a breach that causes no damages. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (stating that a required element of a breach of contract action is "damages caused by the breach").

21

The parties do not dispute that the APA and Warne's Consulting Agreement[8] were enforceable contracts.[9] Defendants assert that West Tennessee Air and Warne breached the APA by failing to transfer goodwill, customer lists, and customer information, and purporting to sell West Tennessee Air Service, LLC's trade name, which they later discovered had no commercial value because it was an unknown entity. They assert that Warne breached the Consulting Agreement by failing to perform or by contracting to perform a service that he could not provide. These included (i) maintaining records of chemicals applied as required by the Tennessee Department of Agriculture; (ii) maintaining records for all customer dates/locations of work; (iii) maintaining an FAA 137 operator's certificate as chief pilot over operations; and (iv) his contractual duty to "work with managers of Nutrien Ag Solutions to maintain vendor contract with WTAS to provide exclusive service as 'on call' provider for work as needed." They also contend that he breached the non-compete and non-solicitations clauses of the Consulting Agreement.

In support of their argument, Defendants point to the following evidence in the record. Warne had a duty under the Consulting Agreement, subparagraphs (e) to "maintain records of chemicals applied as required by the Tennessee Department of Agriculture" and (f) to "maintain records for all customer dates/locations of work." (ECF No. 7-1, PageID 104.) This obligated Warne to make and maintain "work orders" which provided certain customer and application information required by the Federal Aviation Administration ("FAA"), U.S. Department of Agriculture ("USDA"), and under the Worker Protection Standard ("WPS").

---

[8]   The "Consulting, Non-Competition, and Confidentiality Agreement with Monte Warne" ("Consulting Agreement") is Exhibit E of the APA.
[9] West Tennessee Air and Warne do dispute that there was an exclusive on call agreement between West Tennessee Air and Nutrien and that any such agreement was part of the APA. Instead, Warne claims that he and Bradley/Nutrien had an "understanding."

Warne has acknowledged that, in July 2021, he stopped keeping the records and instead handed over that duty to the Riches. However, he insists that the Riches were in agreement with his doing so. Defendants counter his assertion by stating that they were only in agreement because Warne and Mrs. Bradley were not doing a good job and they had to take over this duty. Whether Warne breached his contract with Defendants by failing to do this duty without cause is a factual question for the jury.

Next, Defendants claim that Warne breached his contractual duty to maintain his FAA Part 137 operator's certificate as chief pilot over WTAS operations. Federal Aviation regulations require operators of crop-dusting planes to obtain a special license. 14 C.F.R. § 137. The Consulting Agreement required that Warne "maintain FAA 137 operator's certificate as chief pilot over operation." (ECF No. 1-7, PageID 104.) However, Warne admitted in his deposition that he ceased to maintain his Part 137 certificate in approximately February 2022. The jury could find that Warne's actions amounted to a breach of his contract with Defendants.

Defendants also claim that Warne breached his contractual duty to maintain an exclusive service agreement with Nutrien, which turned out to be non-existent, and breached his non-compete and non-solicitation agreements. As for the purported "exclusive service agreement with Nutrien," the parties dispute whether the language in the APA provided for such. The language in question is as follows: "Work with managers of Nutrien Ag Solutions to maintain vendor contract with WTAS to provide exclusive service as 'on-call' provider for work as needed[.]" (Asset Purchase Agreement, Exhibit E ¶1(d) [PageID104].) According to Warne, the term "WTAS" – the entity for which a vendor contract was to be maintained – means "WTAS, LLC" and not West Tennessee Air Service, LLC. Warne interprets the provision as meaning that WTAS would enter into agreements with vendors and that he would work to maintain that agreement once made.

According to Defendants, the provision should be interpreted to read "Work with managers of Nutrien Ag Solutions to maintain [West Tennessee Air Services' existing] vendor contract with WTAS to provide exclusive service as 'on-call' provider for work as needed."

> When interpreting a contract, a court's task "'is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973) (quoting 17 AM. JUR. 2d, *Contracts*, § 245)). Courts ascertain the parties' intent by considering "'the usual, natural, and ordinary meaning of the contractual language.'" *Id.* at 889-90 (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). If the contractual language is clear and unambiguous, "the literal meaning of the language controls," and the determination of the parties' intent "is generally treated as a question of law because the words of the contract are definite and undisputed," leaving no genuine factual issue for a court or jury to decide. *Id.* at 890 (citing 5 Joseph M. Perillo, CORBIN ON CONTRACTS, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)).

*Edward Jones Tr. Co. v. Woods*, 2024 WL 2795844, at *4 (Tenn. Ct. App. May 31, 2024).

Interpretation of written documents is generally a matter of law for the court. *Allstate v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *see also Nelson v. Wal–Mart Stores*, 8 S.W.3d 625, 628 (Tenn. 1999). However, it can become an issue for the trier of fact if the document is ambiguous and additional evidence is needed to determine the meaning of the document. *See Adkins v. Bluegrass Ests., Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) (citing *Planters Gin v. Federal Compress*, 78 S.W.3d 885, 890 (Tenn. 2002)). Ambiguity arises when a contractual provision may reasonably be read to have more than one meaning; ambiguity does not arise merely because the parties interpret their contract differently. *See Healthmart USA, LLC v. Directory Assistants, Inc.*, 2011 WL 1314662, at *3 (Tenn. Ct. App. Apr. 6, 2011).

> The question of what constitutes an ambiguous insurance contract is well-settled in Tennessee: "[When] language in an insurance policy is susceptible of more than one reasonable interpretation, [ ] it is ambiguous." *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn.1993) (citing *Moss v. Golden Rule Life Ins. Co.*, 724 S.W.2d 367, 368 (Tenn. Ct. App. 1986)). In other words, "'[a]mbiguity' in a contract is doubt or

uncertainty arising from the possibility of the same language being fairly understood in more ways than one." *NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins. Co.*, 968 S.W.2d 791, 795 (Tenn. Ct. App. 1997) (citing *Hillis v. Powers*, 875 S.W.2d 273, 276 (Tenn. Ct. App.1993)).

*Stonebridge Life Ins. Co. v. Horne*, 2012 WL 5870386, at *4 (Tenn. Ct. App. Nov. 21, 2012).

If the contract is ambiguous even after this Court applies the pertinent rules of construction, then the interpretation of the contract "become[s] a question of fact such that summary judgment is not proper." *Planters Gin Co.*, 78 S.W.3d at 890 (citing *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir.1981)). The meaning of the contractual language before the Court is not "clear and unambiguous," and "the literal meaning of the language" cannot be ascertained by the Court, nor can the Court determine the parties' intent. Therefore, the meaning of the purported "exclusive service agreement with Nutrien" provision is ambiguous and will be a matter for the jury to decide.

However, even if Warne's interpretation of the provision is correct such that the APA did not provide that there was an exclusive vendor contract between West Tennessee Air and Nutrien that was being transferred to Defendants, he was contractually obligated to work with Nutrien and its managers (Bradley) "to maintain vendor contract with WTAS to provide exclusive service as 'on-call' provider for work as needed." The jury could find from the following evidence, if believed, that Warne did not work with Nutrien and WTAS to facilitate an arrangement for WTAS to provide an "exclusive service as 'on-call' provider for work as needed" and, therefore, breached this provision of the contract.

For example, there is evidence that Warne disparaged the Riches to Bradley, which, the jury could find, hindered (as opposed to facilitating) the working relationship between Bradley (Nutrien) and Defendants in violation of the contractual provision. Defendants have submitted various text messages between Warne and Bradley (ECF No. 264-11) as follows. Beginning in the

summer of 2021, Warne began suggesting to Bradley that he (Bradley) would not be able to work with the Riches or without Warne, e.g., "Kaleb can't work he has dirty laundry" and "Kaleb not flying girlfriend here." (PL-WestTennAS-2470, PL-WestTennAS-2471.[10]) Warne then began referring to Kyle Rich as "papa bear," (PL-WestTennAS-2473) and Kaleb Rich as "Sky King" (PLWestTennAS-2477). Six weeks later, Warne messaged, "They don't want me to fly anymore too much $$$ so I guess ur with Sky King. I see problems coming." (PL-WestTennAS-2491) There is evidence from which the jury could find that Warne began disparaging Kaleb Rich's mental acuity as a pilot and suggesting the Riches did not have the right pilots for Bradley's jobs. Speaking about "Loader boy John," Warne said, "He's a lot sharper than Sky king for sure." (PL-WestTennAS-2478.) And he disparaged his work ethic, "I'll wake Kaleb up at 10 when I get back and give [some checks] to his lazy ass." (PLWestTennAS-2488.) Also, "They stuck a green pilot in a rocket." (PLWestTennAS-2500.) And, "Who the fk thinks this isn't a risk is nuts." (*Id.*)

Additionally, Melody Rich testified in her deposition that Warne failed to introduce them to his customers despite their repeated requests. (M. Rich Depo., ECF No. 254-2, PageID 5461.) She further testified that, while the parties were negotiating the sale of West Tennessee Air, Warne stated that "everybody knows me," but later disclaimed this statement by saying "I don't know these customers… I rely on Wes." (*Id.* at PageID 5462.) Warne has responded that the contract did not require him to introduce Defendants to any customers. However, the jury could find that Warne breached section 2 of his Consulting Agreement obligating him to perform work ethically and devote the time necessary to ensure that WTAS continues operate "efficiently" and at

---

[10]   The parties have used Bates Stamp Numbered Exhibits (ECF No. 264-11) when identifying these statements. In the future, it would be helpful to the Court if the parties referred to PageID numbers.

"capacity...." when he allegedly failed to assist the Riches in meeting his former "customers." (ECF No. 7-1, PageID 104.)

Defendants also claim that Warne breached the Consulting Agreement that provides that he shall "not compete or prepare to compete with WTAS in the Business, directly or indirectly, or in any capacity, anywhere within a one hundred (100) mile radius of anywhere WTAS previously or currently performs business." (ECF No. 7-1, PageID 105.) "In addition, during the Restrict Period, Warne shall not encourage, in any way or for any reason, any suppliers, customers, or prospective customers, to sever or alter its relationship with WTAS[.]" (*Id.*)

Defendants have submitted evidence, which, if believed by the jury, indicates that Warne did, in fact, breach those provisions. On December 19, 2020, as Warne was discussing the proposed transaction with Bradley, he stated "On a sour note if they quit us or worse yet crash I'll have the $ to buy another plane and continue working. This would be confidential between us of course." (PL-WestTennAS-2394.) Although this statement was made prior to the execution of the contract, the jury could find it to be evidence of Warne's state of mind going into the transaction. The undisputed facts listed above show that:

Wes Bradley, for Nutrien, used Aerial Solutions to provide crop-dusting service for its customers from September 2022 through March 2023. At that point, Bradley began using Monte Warne exclusively until the end of October 2023. In November 2023, Bradley apparently engaged Aerial Solutions again.

Warne began flying and working for H&H in April 2023, at which time Wes Bradley began giving all Nutrien's work to H&H. During the 2023 season, Nutrien paid H&H $337,824.

Warne collected 20% of what Nutrien paid to H&H. Warne does not dispute this statement but contends that this activity did not occur until after WTAS and the Riches allegedly breached the installment promissory note and thereby voided the non-compete agreement. Warne asked for his $60,000 payment to be delayed until February 7, 2024.[11]

---

[11] According to the deposition testimony of Jeremiah Hollingsworth, corporate representative for H&H Flying Service, prior to Warne's beginning to fly for H&H in May 2023, H&H had never

Warne admits that he directly competed against the Riches by taking Nutrien's work and soliciting other customers of the Riches, including Sterling Edwards. However, he again maintains that this activity did not occur until after WTAS and the Riches allegedly breached the installment promissory note and voided the non-compete agreement. Warne thanked Bradley in 2023, saying, "Been a good year for me. Thx!!"

Whether and to what extent Warne competed against Defendants and when his competition began are questions of fact for the jury to decide, thus precluding summary judgment.

Because Defendants' breach of contract claim is replete with factual disputes which are material to their claim, the Court denies this portion of their motion for summary judgment. The Court must also deny Defendants' motion for summary judgment on West Tennessee Air and Warne's claim that they breached the APA. It is undisputed that, at a certain point, Defendants stopped making payments as required under the contract. Whether they had grounds to do so is a question for the jury. As for West Tennessee Air and Warne's cross-motion for summary judgment on the issue of causation, Defendants have presented enough evidence, if believed, for the jury to find that their loss of business and income was caused by the actions of Warne as described above.

Count Four – Tortious Interference (Warne)

West Tennessee Air and Warne have moved for summary judgment on Defendants' claim of tortious interference with business relationships. Defendants have alleged that West Tennessee Air and Warne were aware of the existence of Defendants' business relationships with their then-existing customers and the prospective relationship with growers in Dyer, Gibson and Carroll Counties; they were at all times relevant, aware of the existence of Defendants' business relationship with Bradley and Nutrien; they intended to cause the termination of the business relationship between Defendants and their current grower customers, Bradley, and Nutrien; they

---

done any business with Bradley or with Nutrien. (Hollingworth Depo. ECF No. 254-3, PageID 5435, 5436.)

intended to cause the termination of the business relationship so that they could resume working for those customers; they caused the termination of the business relationship between Defendants and their current grower customers by communicating improper and untrue statements to the customers, business vendors, and other third parties in order to destroy Defendants' goodwill in the community; they caused the termination of the business relationship between Defendants and Bradley and Nutrien by breaching the terms of the APA and the Consulting Agreement, and, as a result of their actions, Defendants lost the business of current customers, prospective growers, Bradley, and Nutrien, thereby injuring Defendants.

In Tennessee, to establish a claim for intentional interference with business relationships, the following elements must be shown.

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means ... and finally, (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation omitted). "A claim of tortious interference with a contract or a business relationship requires the existence of a three-party relationship — the plaintiff, the breaching party, and the interfering party — reflecting the principle that a party to a contract may not be liable for interference with the contract." *Kolstad v. Leehar Distributors, LLC*, 2018 WL 6832086, at *6 (M.D. Tenn. Dec. 28, 2018).

In the present case, West Tennessee Air and Warne claim that they are entitled to summary judgment on this claim because Defendants have not shown an "improper motive or "improper means." They also again raise their causation defense. As for improper motive or means, in

*Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169 (Tenn. App. 2007), the

Court explained:

> The fourth element of the tort was required as a prerequisite to the Court's recognition of the tort; namely, that a defendant must have an "improper motive" or use "improper means." It is important to note that *either* "improper motive" or "improper means" will suffice. *Id.* This is the element of the tort that is most relevant in this particular case. The Court in *Trau–Med* attempted to provide guidance as to how we can recognize "improper motive" or "improper means," even though it acknowledged that a precise or all-encompassing definition of "improper" was neither possible nor helpful. *Id.* at 701 n.5. Impropriety will depend on the facts and circumstances. *Id.* However, the Court held that, in order to show that defendant had an "improper motive," the plaintiff must prove that defendant's "predominant purpose was to injure plaintiff." *Id.*
>
> With regard to "improper means," the Court provided some examples. The Court described these "improper means" as means that are illegal, independently tortious, or that violate an established standard of a trade or profession. *Id.* Examples of illegal or tortious conduct include violations of statutes, rules, or recognized common law rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty. *Id.* Less susceptible to a clear definition, the Court in *Trau–Med* also included within "improper means" "unethical conduct" described as sharp dealing, overreaching or unfair competition. *Id.*

*Id.* at 176-177 (internal quotation marks and footnote omitted).

The Court in *Tennison Bros. v. Thomas*, 2014 WL 3845122 (Tenn. Ct. App. Aug.

6, 2014), analyzed *Watson's* as follows:

> In *Watson's*, Carpet Den was a competitor of Watson's, and Watson's claimed that Carpet Den was interfering with Watson's acquired business relationships in order to improve its own business. In *Watson's*, we stated that "[w]hen two competitors are competing over the same business, separating the interest in improving one's own business and taking business away from the competitor would seem problematic." *Id.* at 183. However, in *Watson's*, we did not have to consider the motive or predominant purpose because of the existence of improper means:
>
> > That is because either improper motive or improper means may support liability for tortious interference. Thus, even if a competitor enjoys a privilege that negates the improper motive requirement, it is not insulated from liability if the other requirement is present, i.e., improper means. The Restatement recognized this distinction in § 768(1), quoted above, by providing no protection to a competitor under subsection (b) who uses

> "wrongful means." **Rephrased, a competitor may be liable for damages under § 768(1) of the Restatement if it uses "improper means," regardless of the motive.**
>
> *Id.* at 176 (emphases added). Based upon the foregoing in *Watson's*, we affirmed the award of damages of over $1.6 million against Carpet Den and Rick McCormick for tortious interference with business relationships after concluding that the defendants used improper means, including making defamatory statements, which resulted in a loss of the business relationship. *Id.* at 174, 184, 186. In so ruling, we stated that "the competitor's privilege does not apply to prevent liability based on wrongful means, methods, or conduct." *Id.* at 185.

*Tennison Bros.*, 2014 WL 3845122, at *11.

As discussed above, examples of illegal or tortious conduct include fraud, misrepresentation, and defamation. If the jury believes Defendants' evidence as to its claims of fraud and misrepresentation, the jury could find "improper motive" or "improper means" under *Watson's*. Additionally, Defendants have presented evidence, if believed, of defamatory remarks made by Warne to Bradley about the Riches. This also supports a finding by the jury of "improper motive" or "improper means." *See ChampionX, LLC v. Resonance Systems, Inc.*, 726 F.Supp.3d 786, 837 (E.D. Tenn. 2024) (identifying violations of statutes or rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty as "improper motive" or "improper means").

Turning now to causation, the Court has already found that there are disputed issues of material fact that preclude summary judgment on causation as to any of Defendants' claims. West Tennessee Air and Warne have presented evidence that Bradley was unhappy with Defendants because they refused a flying job, while Defendants point out that they only refused one job for reasons that Bradley said he understood. There is also a dispute as to whether the arrangement with Mrs. Bradley and her bookkeeping services was, in actuality, a "kickback" arrangement about

which Warne knew the nature before selling West Tennessee Air to Defendants. The jury will determine whether partially dispensing with Mrs. Bradley's services resulted in the loss of Bradley and Nutrien's business or whether it was Defendants' job performance. Accordingly, West Tennessee Air and Warne are not entitled to summary judgment on this claim.

Count Five - Tennessee Consumer Protection Act ("TCPA")

West Tennessee Air and Warne have also moved for summary judgment on Defendants' claim that they violated the TCPA. The TCPA provides that "[a]ny person[12] who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1). A deceptive act or practice includes a material representation, practice, or omission likely to mislead a reasonable consumer. *See Asurion, LLC v. SquareTrade, Inc.*, 407 F. Supp. 3d 744, 751 (M.D. Tenn. 2019) (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997)). Thus, non-disclosure of facts can also be "deceptive" in violation of the TCPA. *See Cavette v. Mastercard Inter., Inc.*, 282 F.Supp.2d 813, 818-19 (W.D. Tenn. 2003). "Whether a specific representation is 'unfair' or 'deceptive' is a question of fact." *Asurion, LLC*, 407 F. Supp. 3d at 751 (citations omitted). The

---

[12] A "person" under the TCPA is defined as a "natural person, individual, governmental agency, partnership, corporation ... and any other legal or commercial entity however organized." § 47-18-103(18). Thus, the Tennessee Supreme Court held in that "corporations have standing to bring a private cause of action for treble damages under Tenn. Code Ann. § 47-18-109(a)." *HYC Logistics Inc. v. OJCommerce, LLC*, 2025 WL 1787437, at *6 (W.D. Tenn. June 26, 2025) (quoting *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 630 (Tenn. 2000)).

TPCA should "be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." *Masters Ent. Grp., Inc. v. Aurich*, 2020 WL 13617690, at *4 (M.D. Tenn. Aug. 25, 2020).

Defendants assert that Warne's deceptive acts primarily involve two matters: (1) he made deceptive statements about his customer base and goodwill in the community and (2) he made statements deceiving Defendants about his and West Tennessee Air's relationship with Nutrien both with respect to the existence of an exclusive service contract and the purpose of the Kelli Bradley payments. According to Defendants, each of these separately constitute separate violations of the TCPA.

The Court has already found that there are disputed issues of fact as to the "exclusive" service contract provision and the purpose of the Kelli Bradley payments. If the jury finds that Warne made misrepresentations concerning these matters or failed to disclose matters that he should have disclosed, then the jury could find that he engaged in a deceptive practice. The jury could also find that Warne intended to cause a "likelihood of confusion or of misunderstanding"— and, in fact, did cause — as to the relationship or association between West Tennessee Air and Nutrien and whether there was an exclusive agreement between them. As for Defendants' claim that Warne's "willful nondisclosure and misrepresentation" as to the nature and source of his customers was a deceptive practice in violation of the TCPA, disputed issues of fact revolve around this claim, thus precluding summary judgment.

Warne responds by asserting that Defendants' contention that West Tennessee Air had no customers of its own is a "distortion of the facts." According to Warne, West Tennessee did have customers – they just "came through Bradley." The jury could find that part of the goodwill that Defendants purchased was Warne's relationship with the customers – not Bradley's relationship

33

with them. Warne also argues that there was no risk of the Riches being confused as to the source of Warne's customers because they "had sufficient opportunity to seek clarity" as they were introduced to Bradley before they signed the APA.  Warne has cited no authority showing that Defendants had an obligation to investigate the representations that he made to them or that Bradley had a duty to clarify any alleged misrepresentations made by Warne. It will be for the jury to decide if Warne led Defendants to believe that he had established goodwill with other customers rather than having Bradley as his only customer and that his business with Bradley was secured by a kickback. The jury must also decide if any misrepresentations made by Warne as to West Tennessee Air's association with Nutrien were made for the purpose of causing confusion as to West Tennessee  Air's affiliation, connection, or association with Nutrien in order to induce the Riches to purchase West Tennessee  Air.

The Court has already discussed the disputed issues of fact surrounding the cause of Defendants' loss. For those same reasons, the Court finds that there is a disputed issue of fact as to causation concerning Defendants' TCPA claim.

<u>Conclusion</u>

This case is replete with disputed issues of material fact on all claims brought by the parties. Accordingly, the cross-motions for partial summary judgment must be **DENIED**. This matter will proceed to trial.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  March 6, 2026.

34