### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

WEST TENNESSEE AIR SERVICE, LLC,

        **Plaintiff/ Counter-Defendant,**

vs.                            **Civil Action No. 1:23-cv-1132-STA-jay**

WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,

        **Defendants/Counter-Plaintiffs.**

---

WTAS LLC, KYLE E. RICH, and MELODY
L. RICH,

        **Third-Party Plaintiffs,**

vs.

MONTE WARNE, MARIANNA WILLIAMS,
Individually; THOMAS BAKER MILLER, as
TRUSTEE of the MEREDITH Z. WARNE
FAMILY TRUST; and ASHLEY & ARNOLD,
a partnership,

        **Third-Party Defendants.**

---

### ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION, GRANTING ATTORNEY'S FEES, AND DENYING REQUEST FOR ADVERSE INFERENCE RULING

Defendants/Counter-Plaintiffs/Third-Party Plaintiffs WTAS LLC, Kyle E. Rich, and

Melody L. Rich ("the Riches") have moved for a temporary restraining order ("TRO") which the

Court will construe as a motion for a preliminary injunction[1] and sanctions pursuant to Federal

Rule of Civil Procedure 65 and the Court's inherent authority to protect witnesses and safeguard

the integrity of its proceedings. (ECF No. 311.) The Riches also seek a ruling that the conduct of

Monte Warne that is the subject of their motion is admissible at trial under Fed. R. Evid. 404(b).

A hearing was held on the motion on April 24, 2026. The parties presented witnesses and

introduced various exhibits at the hearing. At the conclusion of the hearing, the Court admonished

both parties to have no contact with each other or with the family members of the parties to this

lawsuit pending the issuance of a written order.[2]

The Court allowed the parties to file post-hearing briefs as to the issues before the Court.

Plaintiffs/Counter-Defendants/Third-Party Defendants West Tennessee Air Service, LLC and

Monte Warne have filed their brief (ECF No. 326), and the Riches have filed their reply. (ECF No.

328.)  After considering the testimony of the witnesses at the hearing, the exhibits, and the written

briefs, the Court finds as follows.

<u>Background</u>

The Riches allege that, on March 25, 2026, Warne deliberately used his aircraft as a

"weapon of intimidation," flying it directly at their son Kaleb's plane — passing within

approximately 200 feet — while Kaleb was performing aerial application work, i.e., crop-dusting.

They contend that, in so doing, Warne physically endangered Kaleb's life.  They further allege

that Warne sought to disparage Kaleb and the Riches to Kaleb's employer.

---

[1]  The Court generally applies the same standard to TROs and preliminary injunctions. *See Hairston v. Sparks*, 2022 WL 1046367, at *2 (S.D. Ohio Apr. 7, 2022) (citations omitted). The main difference is that a TRO is issued without notice the other party while a preliminary injunction is issued after notice and a hearing. *Id.*

[2]  Throughout the pendency of the Riches' motion, Monte Warne has agreed to stay away from Kaleb Rich although he does not agree to the facts as presented by the Riches. Nor does he agree to the imposition of sanctions.

The Riches claim that Warne's alleged conduct is a violation of federal law, constituting intimidation, tampering, and retaliation of a witness (in this case Kaleb) in an official proceeding under 18 U.S.C. §§ 1512–1513, and that Warne's conduct necessitates the issuance of an injunction prohibiting any such future behavior and also warrants the imposition of sanctions. According to the Riches, they face an ongoing threat that defending against Warne and West Tennessee Air's claims and pursuing their own claims jeopardizes their son's life and his job and their family. They ask the Court to enjoin Warne from attempting to further intimidate, tamper with, or retaliate against Kaleb or any other identified witness. They also seek sanctions against Warne in the form of payment of their attorney's fees and expenses for having had to bring this motion and a ruling that evidence of Warne's conduct will be admissible at trial.  Warne denies the allegations and, instead, claims that Kaleb piloted his plane toward Warne's on the day in question.

Standard of Review

As pointed out by the Riches, federal courts possess broad inherent authority to safeguard the integrity of judicial proceedings and to protect witnesses and parties from intimidation, harassment, and threats of harm. *See United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007) ("A federal court's authority to protect the integrity of its proceedings encompasses the authority to take reasonable actions to avoid intimidation or coercion of witnesses."); *Greene v. Independent Pilots Association*, 2018 WL 1022592, at *6 (W.D. Ky. Feb. 22, 2018) ("This inherent authority to sanction derives from the court's equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings." (internal quotations and citations omitted)). *See also Bleecher v. Nightingale Nurses, LLC.*, 2010 WL 3834645, at *7 (S.D. Fla. Sept. 8, 2010), rep. & rec. adopted sub nom. *Bleecher v. Nightingale Nurses*, 2010 WL 3834655 (S.D.

3

Fla. Sept. 28, 2010) (noting that a Court may issue an injunction under the All Writs act, 28 U.S.C. § 1651(a), a codification of the Court's inherent power to protect its jurisdiction.) A request to protect the safety of potential witnesses may be "considered under the Court's 'inherent equitable powers to ensure full and fair proceedings' or a preliminary injunction under Rule 65." *Gladu v. Magnusson*, 2025 WL 2636567, at *2 (D. Me. Sept. 12, 2025), adhered to on denial of reconsideration, 2026 WL 1021066 (D. Me. Apr. 15, 2026).

Injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In exercising its discretion as to whether to issue an injunction, the Court must consider four factors: whether (1) the movant has shown a likelihood of success on the merits; (2) the movant would suffer irreparable injury without the injunction; (3) the injunction will cause substantial harm to others; and (4) the public interest would be served by issuance of the injunction. *See Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1393 (6th Cir. 1987). "These factors are not prerequisites which must be met but are interrelated considerations that must be balanced together." *Northeast Ohio Coalition for Homeless and Service Employees*, 467 F.3d 999, 1009 (6th Cir. 2006) (citation omitted). The movant bears the burden of establishing that the factors weigh in favor of granting an injunction. *See Cornell McCreary v. Wertanen*, 2009 WL 1874025, at *1 (W.D. Mich. Feb. 11, 2009), rep. & rec. adopted sub nom. *McCreary v. Wertanen*, 2009 WL 1874080 (W.D. Mich. June 29, 2009).

Warne appears to dispute only the first factor – likelihood of success on the merits – in that he contests the version of the events proffered by the Riches. That is, he does not dispute that, if the Court finds the Riches' version to be credible and Warne's version not credible, the Riches

4

would suffer irreparable harm without an injunction, the issuance of the injunction would not cause substantial harm to others, and the public interest would be served by granting an injunction. Accordingly, the Court must decide whether the Riches have met their burden to show that their version of the events is more credible than the version described by Warne.

<u>Hearing Testimony and Evidence</u>

The testimony and evidence presented at the hearing established the following. Kaleb Rich is a certified pilot employed as the Chief Pilot for Rainey Aerial Ag, LLC ("Rainey Aerial Ag"), an agricultural aerial aviation company that operates aircraft under a Federal Aviation Administration Part 137 agricultural aviation certificate. Kaleb previously worked for WTAS as an aerial applicator and in that employment worked with Warne.

Kaleb met Warne during the negotiations for the sale of Warne's crop-dusting business to WTAS and his parents. In particular, he was part of the discussions, *inter alia*, as to the sale of the goodwill of the business, the customer base, pricing, and the average amount of acres per year to be sprayed.

In April 2023, after Kaleb stopped working with Warne, they had a conversation during which Warne asked Kaleb what he thought about the lawsuit between him and the Riches. According to Kaleb, Warne told him that "it would not end well for [his] family or their business" and that Kaleb "would not make it in Tennessee and [Warne] would [make] sure of that." (TR. Kaleb Rich p. 17, ECF No. 319.) Additionally, Warne contacted Brycen Rainey either right before or right after the beginning of Kaleb's employment and made comments to Rainey that Kaley was incompetent as a pilot, had lied about the hours in his logbook, and was uninsurable in the aircraft he was flying.

On March 25, 2026, Kaleb was performing crop-dusting work for Rainey Aerial Ag, applying fertilizer to a customer's field. The field is located approximately one mile away from Rainey Aerial Ag's office and is adjacent to a landing strip owned by a neighboring aerial application company, the McGuire Airstrip. While Kaleb was performing his work, he received a phone call from Tim Fox, a neighbor, whose farm and airstrip are approximately 4.5 miles east of the field on which Kaleb was working, advising Kaleb that he had observed Warne flying in Kaleb's direction. Shortly thereafter, Kaleb observed Warne's aircraft - a yellow Piper PA-11. Kaleb personally recognized the Warne Aircraft from his prior employment with WTAS. Kaleb was flying a blue and white Model AT-802.

At the time, Kaleb was flying south to north applying fertilizer, then climbing to approximately 600 feet, turning to make another pass over the field (flying north to south), making repeated passes over the field. During that climb, according to Kaleb's testimony, the Warne aircraft was flown underneath Kaleb's plane with approximately 500 feet of separation. That is, Warne was flying about 100 feet off the ground.

The Warne aircraft was headed toward the west end of the McGuire Airstrip. Kaleb completed his turn and made another pass from north to south through the field. Kaleb observed the Warne aircraft circling west of the McGuire Airstrip. At that time, Kaleb extended his turn to the south and called his boss, Brycen Rainey, asking him to come outside and observe the Warne aircraft. The Warne aircraft was then lined up to land on the McGuire Airstrip while Kaleb continued his work, which, according to Kaleb, lessened his concern about Warne's intentions. Kaleb flew back into the field, making a pass from south to north while also keeping an eye on the Warne aircraft.

Kaleb further testified that, as he was approximately halfway through this pass over the field, the Warne aircraft accelerated and lifted back up from its landing path instead of landing. Its nose was turned directly at Kaleb's aircraft.

> And about half way through that pass to the north, when I glanced back again, his aircraft had been accelerated, picked back up off the ground, and banked in my direction, and leveled his wings in a, basically a collision course with my aircraft.
> …
> [He was] [d]irectly above the runway. He was within 10 feet of the runway, right around this area right here. And then I was about halfway through the pass right here. And that is when I observed his aircraft coming back up off the runway, banking his wings to the right, and then leveling them with his nose directly pointed at mine.
> …
> He's now pointing his nose to the southeast directly at my aircraft.
> …
> Before I could really even think or react, we met, and his aircraft passed directly behind and under me. And abruptly pulled up and then turned, which he's behind me and under me at this point.

(*Id.* at pp. 29-30.)

Eventually, Kaleb observed the Warne aircraft level its wings and fly out of the field, and Kaleb resumed his work. As Kaleb leveled off in the field and passed by the Warne aircraft, Kaleb observed the Warne aircraft make another sharp turn back toward the field that Kaleb was working. The Warne aircraft crossed over the northern part of the field, made another sharp turn to the east, and landed at the McGuire Airstrip. Kaleb observed Warne get out of the Warne Aircraft and stand on the McGuire Airstrip, watching Kaleb while he completed his work.

Rainey's security camera on the side of its office building videoed part of the incident - specifically the part of the incident "at the end where the Warne aircraft suddenly appears again from the runway at [Kaleb's] aircraft." (*Id.* at p. 35.) The video shows Warne aircraft directly below Kaleb's plane after he accelerated rather than landing his plane.[3]

---

[3] The video was admitted into evidence as Exhibit 4.

In describing the events shown by the video, Kaleb testified that after Warne passed underneath him:

> "[T]his is when I extended my turn to the north. Then he continued in my field and made those -- which it's very hard to see with the trees here -- but made those small kind of banking his wings, rocking, going over the edge of my field.
>
> And then we can see him departing the field to the east, which is when I come back into view, attempting to make another pass, until he makes a hard 180 back towards the field, to which I just stay high and continue on to the south and get out of the way.
> …
> After that is when I was flying around to the south, just staying away from the field. And that's when he came back across my field, and then turned back to the north, and crossed McGuire's Airstrip, and came back around and finally landed.

(*Id.* at pp. 40-41.)

> According to Kaleb,
>
> We're taught from the beginning to watch out and observe for other aircraft. It's the responsibility to stay out of other people's way.
>
> And in the agriculture aviation community, it's kind of a agreement between everybody that if there is an airplane there actively working a field, you know, that pilot is sitting there doing a job. And he's already focusing so much on what's going on on the ground that any approaching aircraft are to stay away and not interfere with the aircraft working, because that pilot has got a lot going on in his head.

(*Id.* at pp. 41-42.)

Following the conclusion of the incident, Kaleb finished his work and went back to the Rainey Aerial Ag office. Kaleb testified that he was aware that Brycen Rainey made a phone call to Warne. Kaleb understood that Warne wanted to come to the office to discuss the incident, but Rainey declined his offer. During the phone call, Warne stated that Rainey needed to know about Kaleb and his family.

Kaleb testified that he felt threatened for his own safety and that of his family by Warne's actions. He reported the incident to the Obion County Sheriff's Department and to the FAA.

8

Melody Rich was called as a witness. She testified that she and her husband expected to call Kaleb as a witness in the ongoing litigation. ("He was aware of factual information both from before we signed the contract with Mr. Warne and also after." (Tr. M. Rich, p. 76.)) She also testified that she was not willing to put Kaleb's life in danger or the lives of his family by calling him as a witness if an injunction was not granted.

Warne testified that he had been an ag pilot since 1976 with at least 13,000 ag hours logged. He stated that he was helping a friend learn to fly on the day in question, but the friend did not show up at Tim Fox's field as planned. Thereafter, he decided to fly around between Fox's field and McGuire's Airstrip.

Warne saw a plane working, but he did not know who occupied the plane. He thought it must be a Rainey or a McGuire plane because of the color of the plane. According to Warne, the plane came "straight at him." Warne thought he was on a collision course with the plane, so he dropped down almost to the ground. At that point, the other plane pulled up. At various times, Warne "lost [his] perception of ground and how [he] was turning." (Tr. Warne, p. 121.)

Warne was flying around 80 miles per hour, and the other plane was flying 160 miles per hour. Warne testified that he had a hard time getting away from the other plane. He was finally able to land at McGuire's Airstrip. Until that point, Warne testified that he did not know who was piloting the other plane. The other plane returned to Rainey's airstrip.

Warne then realized that he had a text from Brycen Rainey. Warne called Rainey. According to Warne, he apologized to Rainey. ("I had no intention of doing anything, being in his way. I just flew in here. And I said, he was chasing me. I couldn't get away from him." (*Id.* at p. 94.)) Warne "apologized over and over and over on the phone." (*Id.* at p. 95.) He asked if he could

9

go to Rainey's office and "resolve the matter" because he did not want any "hard feelings." (*Id.* at pp. 95 - 96.)

> I said, man, look, I didn't intentionally do nothing. And I'm sorry if I did. And he kept on and kept on.
>
> I said, man, look, I'm sorry. I told him three times I'm sorry. I said, look, I'm not going to say I'm sorry again.
>
> Let me run over there. Let me just run over there and we'll talk about it. And that's when, you know, he said -- he pretty well said, you come over here -- you know, don't dare come over here, so I didn't.

(*Id.* at p. 124.)

Warne further stated that he told Rainey that he knew that Kaleb would not talk to him. Warne did not go to Rainey's office and, instead, flew home. Warne denied ever attempting to get in Kaleb's way. He did not know that Kaleb was the pilot of the plane until the phone call with Rainey although at a certain point he assumed the pilot was Kaleb.

On cross-examination, Warne acknowledged that he told the Raineys before they hired Kaleb that he did not believe that Kaleb had all the flying hours that he claimed to have. Warne testified that he only called the Raineys as a "friend" – not to degrade Kaleb. He did not want them "to get hung up in an insurance fraud." (*Id.* at p. 108 ("If he crashes that plane, and he doesn't have the hours that he claims he has, insurance is not going to pay.")) Warne had no documentation showing that Kaleb did not have his stated hours; instead, according to Warne, it was "hearsay."

As for the April 2023 conversation that Kaleb reported, Warned admitted telling him, "And I said, don't go any further with this lawsuit. I said, you can't make it without me and my guy that was giving us all the work. Between me and him, they couldn't have made it. And I told him, I said, there is no way you're going to make it here by yourself."[4]  (*Id.* at p. 109.)

---

[4]  Warne admitted during the hearing that his memory was "crap." (*Id.* at p. 110.)

Warne did not contact the FAA about Kaleb's alleged behavior. The FAA has contacted him about Kaleb's report.

Warne then presented Adam McGuire as a witness. McGuire is also an ag pilot and owns McGuire's Flying Service. He was on his airstrip on the day in question. He testified that he observed Warne's yellow plane and then a plane belonging to Rainey. He saw the Rainey plane fly over Warne's plane although "[t]hey never were really close to me in the close enough vicinity to say they were passing over or underneath each other really." (TR. McGuire, pp. 130-131.) McGuire did not see anything out of the ordinary or to cause him any safety concerns. Warne eventually landed at McGuire's Airstrip.

On cross-examination, McGuire acknowledged that Kaleb had reported him to the FAA for drug usage. According to McGuire, the FAA determined that it was a false report.

On re-direct, Kaleb testified that he had talked to McGuire after the incident, and McGuire told him that he did not "see or witness anything" because he was working under his plane. He did not know that Warne was in the area until his plane had already landed. (Tr. Kaleb Rich, pp. 146-147.)

Without objection from the Riches, Warne was allowed to file an affidavit of Carl Eckel, an unavailable witness, in support of his response to the Riches' motion. (ECF No. 315-2.) Eckel's house is next to the landing strip of McGuire's Flying Service. Eckel stated that he was looking out his window one morning "near the end of March" and saw a yellow plane flying slowly. Then he saw a blue and white plane headed toward the yellow plane. The blue and white plane pulled up and flew over the yellow plane. He saw the yellow plane fly in a straight line; he did not see the yellow plane steer toward the blue and white plane. Earlier in the morning, he saw the blue and white plane circling over his house several times.

11

Analysis

Injunctive Relief

The only real issue for the Court as to whether to issue injunctive relief is deciding if the Riches have shown that they are likely to succeed in establishing that Warne attempted to intimidate and harass their son Kaleb Rich in connection with this lawsuit through the deliberate act of flying his plane at Kaleb's plane and by disparaging Kaleb and the Riches to Kaleb's employer. Warne has not argued that the Riches cannot show the other Rule 65 factors if they show likelihood of success on the merits.

The Court finds that the testimony of Kaleb Rich as to Warne's actions was credible, while the testimony of Warne as to his own actions and those of Kaleb's was not credible. In particular, Kaleb gave specific details as to his flight pattern and the flight pattern of Warne, while Warne hedged stating that he "lost [his] perception of ground and how [he] was turning" and that his memory was "crap." The video introduced by the Riches supports Kaleb's testimony as the closeness of the planes. The video showed Warne flying east toward Kaleb within approximately 200 feet, contradicting Warne's testimony that he flew east only to land. Perhaps most telling is Warne's equivocal apology to Brycen Rainey during the phone call after Kaleb had returned to the office. "I said, man, look, I didn't intentionally do nothing. **And I'm sorry if I did.**" (TR. Warne, p. 124 (emphasis added)).

Diminishing Warne's claim that Kaleb flew his plane at him (Warne) and chased him is Warne's testimony that he was not frightened by Kaleb's alleged actions even though Kaleb's plane was much larger than Warne's plane. It is not believable that a pilot, especially one in a small plane, would not be frightened when chased by a larger plane. Tellingly, Kaleb filed a report about the incident with the FAA, but Warne did not.

12

Warne's witnesses, McGuire and Eckel, do not negate the Court's credibility finding. The fact that they did not see Warne being aggressive toward Kaleb does not mean that he was not aggressive – only that they did not see any such actions.

Accordingly, the Court finds that the Riches have shown a likelihood of success on the merits as to their claim that Warne intentionally flew his plane toward Kaleb's plane in an attempt to intimidate him and harass him and that this intimidation/harassment related to Kaleb's role as a witness in the present lawsuit. Although Warne attempts to argue otherwise, Kaleb is clearly involved in the lawsuit. He and Melody Rich both testified that he has knowledge as to the representations made by Warne during the negotiations for the sale of Warne's crop-dusting service. Furthermore, Warne listed Kaleb as a "may call" witness. It is a bit disingenuous for Warne to claim that the Riches would not be harmed if Kaleb does not testify. ("Neither Kaleb Rich nor Melody Rich identified any evidence to be potentially offered by Kaleb Rich that would not be cumulative and would be specifically lost if Kaleb Rich failed to testify.") That is not a decision for Warne to make.

Supporting the Court's credibility determination is Warne's disparagement of Kaleb to his employer and to the Court. Warne admitted that his report to Rainey that Kaleb had falsified his hours was based on hearsay. Throughout the hearing, Warne attempted to disparage Kaleb by claiming that Kaleb was not crop-dusting fields as he claimed on the day in question. Whether or not Kaleb actually was working is not relevant to the issue of whether Warne flew his plane at Kaleb's plane, but Warne's statements do lend credence to the Riches' disparagement allegations. Warne also made gratuitous claims during the hearing as to Kaleb's incompetence as a pilot. The Riches have shown a connection between these comments and their lawsuit with Warne's warning to Kaleb during their April 2023 conversation that the Riches should not go forward with their

13

lawsuit. Thus, the Court finds that Warne made disparaging remarks about Kaleb in an attempt to dissuade the Riches from proceeding with their lawsuit.

The Court finds that the Riches have met their burden to show that the issuance of an injunction against Warne is necessary both to protect them and to protect the integrity of the Court and its proceedings.  Monte Warne will be prohibited from engaging in any conduct that is intended to or may have the effect of intimidating, harassing, or tampering with Kaleb Rich and from engaging in any conduct that constitutes intimidation, harassment, threats, or interference with any other identified witness of the Riches.

Sanctions

The Riches have asked for sanctions in the form of their attorney's fees and costs in filing this motion and evidentiary sanctions including precluding Warne from disputing facts concerning the March 25, 2026 incident and giving an adverse inference instruction at trial if the Court finds that intimidation affected testimony and allowing admissibility of Warne's March 25, 2026 conduct pursuant to Fed. R. Evid. 404(b).

Warne first contends that there is no legal basis for the Court to award the Riches their fees and costs. Warne is in error. The Riches' request for fees as a sanction for Warne's bad-faith extra-litigation conduct is brought under the Court's inherent authority to ensure the integrity of the proceedings before it. The Court's authority to award attorney fees was explained in *Garvais v. Reliant Inventory Sols. Inc.*, 2010 WL 4722260, at \*3 (S.D. Ohio Nov. 15, 2010), rep. & rec. adopted, 2011 WL 347111 (S.D. Ohio Feb. 1, 2011).

> The Supreme Court has held that the federal courts have "[c]ertain implied powers ... which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed.2d 27 (1991). A primary aspect of the Court's inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. "A court's reliance upon its inherent authority to sanction

14

derives from its equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings." *Dell, Inc. v. Elles*, No. 07–2082, 2008 WL 4613978, at *2 (6th Cir. June 10, 2008) (citing *Chambers*, 501 U.S. at 43). The Court must exercise its inherent authority "with restraint and discretion." *Chambers*, 501 U.S. at 44. Furthermore, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id.* at 49.

As the Supreme Court noted in *Chambers*, a court may impose a sanction, such as attorney's fees, when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45–46 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S. Ct. 1612, 44 L. Ed.2d 141 (1975)). The Sixth Circuit has also noted that "[t]he 'imposition of inherent power sanctions requires a finding of bad faith,' ... or conduct 'tantamount to bad faith.'" *Dell*, 2008 WL 4613978, at *2 (quoting *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed.2d 488 (1980)).

… [A]n attempt to interfere with, intimidate, or tamper with a potential witness is sanctionable misconduct. *See Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir.2008) ("Trying improperly to influence a witness is fraud on the court and on the opposing party ...."); *Ramsey v. Broy*, No. 08–CV–0290, 2010 WL 1251199, at *4 (S.D. Ill. Mar. 24, 2010) ("Not only does witness tampering interfere with the judicial branch's ability to function properly, it is a federal crime.") (citing 18 U.S.C. § 1512(b)); *see also United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir.2007) ("A federal court's authority to protect the integrity of its proceedings encompasses the authority to take reasonable actions to avoid intimidation or coercion of witnesses.").

*Garvais*, 2010 WL 4722260, at *3.

In the present case, the Court finds that Warne's attempt to "interfere with, intimidate, or tamper with a potential witness," *id.*, was clearly bad faith conduct or conduct "tantamount to bad faith" and, thus, sanctionable behavior. There would have been no need for the Riches to have to go to the expense of filing this motion and preparing for and participating in a hearing if Warne had not attempted to circumvent the legal system. Therefore, the Court will award the Riches their reasonable attorney's fees and costs associated with preparing and litigating their motion. The Court directs the parties to confer and attempt to reach an agreement as to the proper amount of fees and costs that should be awarded within seven days of the entry of this order. If an agreement

15

cannot be reached, the Riches will have an additional seven days in which to file a fee petition with the Court.

The Riches ask the Court to issue a ruling that Warne's conduct is admissible under Fed. R. Evid. 404(b) as proof of intent to defraud them. Additionally, they ask the Court to preclude Warne from disputing facts concerning the March 25, 2026 incident and to give an adverse inference instruction at trial if the Court finds that intimidation affected any testimony.

At this juncture, the Court finds that the prejudicial effect of allowing evidence related to the incident to be presented to the jury outweighs the probative effect of such evidence under Fed. R. Evid. 403. This rule provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice . . . misleading the jury[.]" The present case involves complex issues with multiple claims and counter-claims. Allowing the jury to focus on Warne's misconduct on March 25, 2026 could well distract the jury from deciding the salient factual and legal issues presented in this case.

However, this is not to say that the events of March 25, 2026, could not become relevant on some other ground. If so, the parties may present their arguments outside the presence of the jury, and the Court will make its decision as to the admissibility of the evidence at that time.

Summary and Conclusion

The Court finds that the Riches have met their burden in establishing all the factors necessary for the granting of an injunction under both Rule 65 and the inherent authority of the Court. Accordingly, their motion for injunctive relief (ECF No. 311) is **GRANTED**.

Monte Warne is hereby **ORDERED** to refrain from any conduct that is intended to or may have the effect of intimidating, harassing, or tampering with Kaleb Rich, whether in person, by telephone, or through third parties and refrain from engaging in any conduct that constitutes

16

intimidation, harassment, threats, or interference with any other identified witness in this litigation. This includes both physical and verbal conduct by Warne. Any further witness contact or interference will subject Warne to sanctions, including but not limited to monetary penalties, a finding of contempt, or case-dispositive remedies.

The Riches are awarded reasonable attorney's fees and costs incurred in investigating, preparing, and litigating this motion as discussed above.

Evidence of the events of March 25, 2026, will not be admissible at trial as a sanction. If the parties contend that the events are relevant on any other issue, the Court will decide that question at trial.

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  June 1, 2026.

17